## SAMUEL V. SCHOONMAKER III *v.* CUMMINGS AND LOCKWOOD OF CONNECTICUT, P.C., ET AL.
### (SC 16078)

McDonald, C. J., and Borden, Norcott, Katz and Peters, Js.

Argued November 4, 1999—officially released March 15, 2000*

*Beverly S. Knapp,* with whom was *L. Douglas Shrader,* for the appellant (plaintiff).

*William H. Narwold,* with whom, on the brief, were *Robert P. Dolian* and *Charles D. Ray,* for the appellees (defendants).

*Opinion*

KATZ, J. This case raises several significant issues on appeal. First, as a matter of first impression for this court, we must determine the proper standard of review that a trial court should exercise in reviewing an arbitration decision involving the interpretation and applica-

* March 15, 2000, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

tion of rule 5.6 of the Rules of Professional Conduct.[1] We conclude that in such a case, de novo review, rather than the traditional, more deferential review afforded to arbitration decisions, is proper. Second, we must determine whether a forfeiture upon competition provision in an employment agreement, as applied to postemployment benefits that become available to former law firm partners without regard to whether those partners fully retire from the practice of law, violates the public policy embodied in rule 5.6. We conclude that, for the purposes of eligibility to collect such benefits, public policy does not require the absolute cessation of the practice of law as a condition of retirement. Finally, we must determine whether an arbitrator violated public policy by invoking a savings clause provision in an employment agreement in order to preserve a forfeiture upon competition provision that otherwise would have violated the public policy underlying rule 5.6. We conclude that such action, when undertaken pursuant to a valid arbitration agreement, does not violate public policy.

The following facts are pertinent to this appeal. The plaintiff, Samuel V. Schoonmaker III, is a former partner in the defendant law firm of Cummings and Lockwood (firm). He was also a stockholder in the firm's parent corporation, Cummings and Lockwood of Connecticut, P.C., which also is a defendant in this action. As both a stockholder and partner, the plaintiff was subject to the defendants' partnership agreement and employment agreement (agreements), both of which were dated January 1, 1993. Both agreements provided for the distribu-

---

[1] Rule 5.6 of the Rules of Professional Conduct provides: "A lawyer shall not participate in offering or making:

"(1) A partnership or employment agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or

"(2) An agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties."

tion of postemployment compensation following an employee's retirement from the firm, and both provided that the parties would arbitrate "[a]ny controversy or claim arising out of or relating to this Agreement . . . ."

The agreements contained nearly identical provisions that provided for the distribution of two different categories of postdeparture benefits. The basic benefit, referred to as the "1x," is payable upon retirement of an employee or stockholder who has been a partner of the firm for at least four years. The supplemental, or "2x" benefit, is payable upon retirement of an employee who has at least twenty years of service with the firm, either as an associate or a partner, and is payable only after the retiring attorney reaches the age of sixty, or has become physically or mentally incapable of continuing to practice law. The sum of the 1x and 2x payments takes into account the length of a partner's service and average annual income over a five year period, and is subject to a cap of 100 percent or 200 percent, respectively, of the partner's five year average income. Both categories of benefits are unfunded and are payable to the retiring partner from future firm income in monthly installments for a period of ten years. Any uncollected revenues become payable on the death of a former partner to a designated beneficiary or to the partner's estate.

Only partners who have retired from the firm are eligible for postemployment compensation. As used in the agreements, however, the term "retirement" is defined broadly to include circumstances other than traditional retirement. Paragraph 6 A of the partnership agreement provides: "The term 'retire' or 'retirement,' as used in this Agreement, shall, in addition to retirement in the usual sense, also include all circumstances (other than by death) under which an individual ceases to be a Partner of the firm (prior to January 1, 1993) or a Stockholder of a Partner, such as resignation or

withdrawal or exclusion resulting from amendment of this Agreement." That same definition of retirement applies to the employment agreement. Thus, in effect, a partner who satisfies the requisite age and longevity criteria is eligible to receive postemployment compensation regardless of the partner's motivation for leaving the firm.

The actual receipt of benefits is conditioned, however, on the former partner's compliance with the agreements' noncompetition provision. Under that provision, payment is forfeited by "any former [employee or stockholder] who retired prior to the age of seventy (70) and who, for any period of time within the period of three (3) years after the effective date of such retirement, engages, either directly or indirectly, in the practice of law" in Fairfield, New Haven or Hartford counties, or certain designated counties in Florida, where the firm also had offices.

Also included in the agreements is a savings provision that empowers the arbitrator to modify the terms of the agreements to the extent necessary to comply with the rules of ethics. The provision specifically addresses the agreements' broad definition of "retire," and provides that postemployment payments do not become available unless, in addition to meeting the express criteria for eligibility, a partner "also satisfies such other or additional conditions or criteria relating to retirement, if there be any, that are required to qualify such benefits as 'benefits upon retirement' within applicable rules of ethics." To that end, the savings clause empowers the arbitrator to construe, and if necessary, reform the agreements "to incorporate any other or additional conditions or criteria required . . . so as to preserve the validity of the non-competition condition . . . and carry out the basic purposes . . . to provide benefits to [partners] upon their retirement."

As managing partner of the firm for several years, the plaintiff took an active role in the construction of the retirement benefits plan. The savings clause provision, in particular, was incorporated into the plan largely at the plaintiff's behest. In 1988, in the wake of a challenge brought by two of the firm's former partners against the firm's forfeiture upon competition clause, the plaintiff, acting as comanaging partner, advocated that the firm should enforce the clause to deter other partners from leaving and competing with the firm. Later, while acting as sole managing partner, the plaintiff, concerned about the validity of the 1x benefits and the noncompetition clause, declined the suggestion of a fellow partner to extend the length of service requirement and impose a minimum age of eligibility, proposing instead the adoption of the savings clause provision. Thereafter, upon the plaintiff's suggestion, the remaining partners approved inclusion of the savings provision into all future agreements.

In April, 1996, after approximately thirty-five years of employment with the firm, the plaintiff, then age sixty, voluntarily resigned to commence his own practice in Fairfield county. Although the plaintiff satisfied the age and length of service requirements for both the 1x and 2x benefits, the firm refused to make any payments of those benefits because the plaintiff had continued to practice law in violation of the noncompetition provision.

The plaintiff filed a demand for arbitration, seeking a declaratory judgment that he was entitled to receive all periodic payments of both basic and supplemental benefits without regard to whether he had engaged in the practice of law in Fairfield county. The plaintiff claimed specifically that the forfeiture upon competition provision violated rule 5.6 by conditioning the receipt of benefits on abstention from the practice of law, and that enforcement of the provision violated

the public policy favoring clients' ability to select an attorney of their choice. In an "Arbitration Opinion and Award" dated May 28, 1998, the arbitrator determined that the practice restriction violated neither the rule itself nor public policy. With respect to the 2x benefits, the arbitrator determined that the forfeiture provision qualified under the "retirement benefits" exception to the rule because payments were conditioned on objective age and length of service requirements that are characteristic of traditional retirement plans. In addition, the arbitrator ruled that the public policy behind rule 5.6, which promotes clients' free choice of lawyers, also permits law firms to provide for retirement through the use of retirement plans that condition payment on noncompetition.

With respect to the 1x benefits, the arbitrator determined that postemployment payments conditioned on only four years of service would not qualify as retirement benefits under currently accepted judicial interpretations of the ethics rules, and therefore, the forfeiture upon competition provision did not fall within the "retirement benefits" exception to rule 5.6. Nonetheless, the arbitrator invoked the savings clause, over the plaintiff's contention that the clause itself was contrary to public policy, so as to make the 1x benefits available under the same conditions as the 2x benefits, and thereby preserve their validity. As to the savings clause, the arbitrator found that the clause represented a good faith attempt by the parties to comply with the dictates of the ethics rules, and therefore was not contrary to public policy. Accordingly, the arbitrator concluded that by practicing law in Fairfield county within three years of his retirement from the firm, the plaintiff had forfeited his entitlement to postemployment benefits.

Thereafter, pursuant to General Statutes § 52-418,[2] the plaintiff filed in the trial court an "Application to

[2] General Statutes § 52-418 provides in pertinent part: "Vacating award. (a) Upon the application of any party to an arbitration, the superior court

Vacate Arbitration Award." In a memorandum in support of that application, the plaintiff argued, in effect, that the trial court should review the arbitrator's decision under a de novo standard of review to determine independently whether enforcement of the award would thwart a well-defined public policy. In addition, the plaintiff argued that the arbitration award violated rule 5.6 and was contrary to the public policy of this state because enforcement of a forfeiture provision against an attorney who has not fully retired from the private practice of law interferes with clients' access to an attorney of their choice. For that same reason, the plaintiff argued, the arbitrator's award had violated public policy by resorting to the savings provision to rewrite and thereby preserve an otherwise invalid forfeiture provision. The plaintiff reasoned that if the savings clause were to be enforced, an attorney would have no incentive to challenge an unethical noncompetition provision. Thus, according to the plaintiff, the savings clause itself encourages violations of the ethics rule.

The defendants thereafter filed an "Application to Confirm Arbitration Award" pursuant to General Statutes § 52-417,[3] arguing that the trial court must afford

for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. . . ."

[3] General Statutes § 52-417 provides: "Application for order confirming award. At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in

the arbitrator's award due deference in that its "findings of fact, legal analysis, and conclusions are based upon a thorough and reasonable interpretation of the legal and factual issues in [the] case, and the award [did] not violate public policy." The defendants made the same claim with respect to the savings clause, arguing that no public policy would be offended by the parties' effort to comply with the ethics rules by empowering the arbitrator to reform the terms of the agreement.

The trial court declined to review the arbitrator's award de novo, holding that " '[t]he public policy exception to arbitral authority should be narrowly construed and a court's refusal to enforce an arbitrator's interpretation of [an employment agreement] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant.' " The court agreed with the defendants that so long as the arbitrator " 'has identified, defined and attempted to vindicate pertinent public policy,' " the arbitration award should not be disturbed if the award's resolution of public policy is " 'reasonably debatable.' " With respect to the postemployment benefits issue, the court determined that the arbitrator had carefully considered the plaintiff's public policy argument, and had reached the reasonable conclusion that the forfeiture provision, as applied to the 2x benefits, and after modification of the 1x benefits, although having some effect on client choice, did not violate the public policy underlying rule 5.6. Giving "great deference" to the arbitrator's findings of fact and legal conclusions, the court rendered judgment in the defendants' favor confirming the award. The plaintiff appealed from the judgment of the trial court to the Appellate Court. Thereafter, upon the plaintiff's motion to transfer, the appeal was trans-

---

session, to any judge thereof, for an order confirming the award. The court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

ferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

The plaintiff claims on appeal that: (1) the trial court should have exercised de novo review of the arbitrator's decision; (2) the trial court improperly failed to conclude that the enforcement of a noncompetition provision with respect to benefits paid to an attorney who has not fully retired from the practice of law violates the strong public policy underlying rule 5.6 in favor of clients' unfettered access to counsel of their choice;[4] and (3) application of a savings clause to reform an otherwise invalid forfeiture provision violates the public policy underlying rule 5.6. The defendants dispute these claims and assert that the trial court properly deferred to the "reasonably debatable" factual findings and legal conclusions reached by the arbitrator as to the public policy undergirding rule 5.6, and the applicability of the savings clause.

As to the first issue, we conclude that because the arbitrator's decision regarding the postemployment payments implicated a legitimate public policy, that is, facilitating clients' access to an attorney of their choice, the trial court should have exercised de novo review. We conclude further, however, that although the public policy embodied in rule 5.6, in part, promotes clients' access to an attorney of their choice, that policy does not require the absolute cessation of practice as a condition of retirement under the retirement benefits exception of the rule. Finally, we conclude that a savings provision included in an arbitration agreement authorizing the arbitrator to preserve the validity of an otherwise impermissible retirement benefits provision itself does not violate public policy when adopted in good faith to ensure compliance with the ethics rules.

---

[4] On appeal, the plaintiff advances no claim that the arbitrator improperly determined the contours of rule 5.6 itself in deciding that the postemployment payments at issue constitute "benefits upon retirement."

## I

The principle issue in this appeal requires us to decide the appropriate standard of judicial review of an arbitrator's application of rule 5.6 of the Rules of Professional Conduct. This issue is one of first impression for this court.

The plaintiff argues that because this case involves a legitimate public policy challenge to arbitral authority, the trial court should have undertaken de novo review of the arbitrator's conclusion regarding whether the noncompetition provision at issue undermines the public policy objectives of rule 5.6, rather than the more limited deferential review traditionally applied to arbitral conclusions. By contrast, the defendants argue that the trial court properly applied a more deferential standard of review, relying on the court's well established public policy favoring arbitration as a preferred method of alternative dispute resolution and the limited circumstances under which the public policy exception to arbitral authority comes into play. As to this issue, we agree with the plaintiff.

Although we recognize the important role that arbitration plays in settling private disputes, we take this opportunity to articulate expressly the role of the judiciary in reviewing public policy challenges to consensual arbitration awards. We conclude that when an arbitrator has been called upon to determine whether an employment agreement violates a legitimate and clearly established public policy, such as that underlying rule 5.6, de novo review is proper.

## A

This court has declared on numerous occasions that arbitration is a creature of contract, "whereby the parties themselves, by agreement, define the powers of the arbitrators." *American Universal Ins. Co.* v. *DelGreco,*

205 Conn. 178, 185, 530 A.2d 171 (1987); see *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, 248 Conn. 108, 122, 728 A.2d 1063 (1999); *O & G/ O'Connell Joint Venture* v. *Chase Family Ltd. Partnership No. 3*, 203 Conn. 133, 145, 523 A.2d 1271 (1987); *Board of Education* v. *AFSCME, Council 4, Local 287*, 195 Conn. 266, 269, 487 A.2d 553 (1985). Moreover, we have stated that when the parties have established the authority of the arbitrator, "the extent of our judicial review of the award is delineated by the scope of the parties' agreement." *Garrity* v. *McCaskey*, 223 Conn. 1, 4, 612 A.2d 742 (1992), citing *American Universal Ins. Co.* v. *DelGreco*, supra, 185. When the parties have not restricted the scope of the arbitrator's authority, "the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission." *Garrity* v. *McCaskey*, supra, 4; *Hartford* v. *Board of Mediation & Arbitration*, 211 Conn. 7, 14, 557 A.2d 1236 (1989); *New Haven* v. *AFSCME, Council 15, Local 530*, 208 Conn. 411, 415–16, 544 A.2d 186 (1988).[5]

The long-standing principles governing consensual arbitration are, however, subject to certain exceptions. Although we have traditionally afforded considerable deference to the decisions of arbitrators, we have also

[5] These principles apply when the arbitration is consensual. It is well established that when the parties have engaged in statutorily mandated arbitration, a reviewing court must exercise a de novo review of the arbitrators' interpretation and application of the law. *American Universal Ins. Co.* v. *DelGreco*, supra, 205 Conn. 187–88. "The simple and ineradicable fact is that voluntary arbitration and compulsory arbitration are fundamentally different if only because one may, under our system, consent to almost any restriction upon or deprivation of right, but similar restrictions or deprivations, if compelled by government, must accord with procedural and substantive due process." (Internal quotation marks omitted.) Id., 187.

In the present appeal, the plaintiff makes no claim that the submission is restricted. Because we find nothing in the record to indicate otherwise, and, more importantly, because it has no bearing on our holding, we proceed under the assumption that the submission in this appeal was unrestricted.

conducted a more searching review of arbitral awards in certain circumstances. In *Garrity* v. *McCaskey*, supra, 223 Conn. 6, this court listed three recognized grounds for vacating an award: "(1) the award rules on the constitutionality of a statute; *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 344, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985); (2) the award violates clear public policy; *Watertown Police Union Local 541* v. *Watertown*, 210 Conn. 333, 339, 555 A.2d 406 (1989); or (3) the award contravenes one or more of the statutory proscriptions of § 52-418 (a).[6] *Carroll* v. *Aetna Casualty & Surety Co.*, [189 Conn. 16, 22–23, 453 A.2d 1158 (1983)]." The judicial recognition of these grounds for vacatur evinces a willingness, in limited circumstances, to employ a heightened standard of judicial review of arbitral conclusions, despite the traditional high level of deference afforded to arbitrators' decisions when made in accordance with their authority pursuant to an unrestricted submission.

B

Although we previously have held that an arbitral award may be vacated if it is violative of a clear public policy, we have never *expressly* articulated the proper standard, de novo or otherwise, for reviewing whether an arbitral decision does in fact violate public policy. Until now, our role in addressing a public policy challenge has been confined largely to determining whether, as gleaned from a statute, administrative decision or case law, there exists a public policy mandate with which an arbitral award must conform. See, e.g., *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, supra, 248 Conn. 126–27 (determining that no authority exists to establish public policy of giving collateral estoppel effect to prior arbitral awards); *Watertown Police Union Local 541* v. *Watertown*,

---

[6] See footnote 2 of this opinion.

*supra*, 210 Conn. 340–42 (criminal statute does not embody "established public policy" of mandatory police stops whenever police officer witnesses traffic violation); *New Haven* v. *AFSCME, Council 15, Local 530, supra*, 208 Conn. 418–19 (no public policy violation where statute does not preclude award of back pay to employee upon reversal of criminal conviction). That question indisputably involves an issue of law properly resolved by an exercise of this court's plenary authority. See *W. R. Grace & Co.* v. *Local Union 759, International Union of United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983); *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998, supra*, 126–27.

Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. We conclude that where a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy.[7]

---

[7] We emphasize, however, that a party raising such a challenge to an arbitral award may not succeed in receiving de novo review merely by labeling its challenge as falling within the public policy exception to the normal rule of deference. The substance, not the form, of the challenge will govern. Thus, the court should not afford de novo review of the award without first determining that the challenge truly raises a legitimate and colorable claim of violation of public policy. If it does raise such a claim, de novo review should be afforded. If it does not, however, the normal deferential scope of review should apply.

First, the identification and application of the public policy of this state presents considerations regarding which courts have greater expertise and knowledge than arbitrators, who are often drawn from the ranks of various professions including, but not limited to, the law. Because in this respect arbitrators and a reviewing court do not stand on equal ground, it comports with logic for the court to review the arbitrator's interpretation of an ethics rule de novo rather than to leave it to the arbitrators themselves to attempt to apply pertinent public policy. Moreover, given that it is the role of the reviewing court to articulate the actual policy objectives that emanate from a particular rule of conduct, so too is a reviewing court better suited to evaluate whether certain facts, as found by the arbitrator, comport with the specific public policy that is at issue.

Second, although in the course of rendering an award an arbitrator may consider whether the award sought would violate or comport with a clear public policy— as the arbitrator did in this case—often the question of whether the award does so will not arise until after the award has been rendered. See, e.g., *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, supra, 248 Conn. 111–12 (question of whether relitigation in subsequent arbitration proceeding of issue involving contract interpretation violates public policy raised in first instance in application to vacate); *Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 336–37 (contention that order of superior officer that served as basis for discharge of probationary employee is against public policy presented in application to vacate arbitration award). Thus, in such a case, there would be no reason to defer to the arbitrator regarding a question that might not have been considered in the arbitration proceeding.

Third, the public policy exception is one of three that we have identified as exceptions to the rule of

deference. The other two include the common-law ground that the award rules on the constitutionality of a statute; see *Caldor, Inc.* v. *Thornton,* supra, 191 Conn. 344; and the statutory ground that the award violates one or more of the proscriptions of § 52-418, such as when the award is in manifest disregard of the law. See *Garrity* v. *McCaskey,* supra, 223 Conn. 10. As a routine matter we, in effect, review de novo the question of whether either of the other two exceptions applies to a given award. See, e.g., *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998,* supra, 248 Conn. 128–32 (reviewing whether arbitrator exceeded authority under § 52-418 [a] [4] in failing to give collateral estoppel effect to prior arbitration award); *Garrity* v. *McCaskey,* supra, 11–13 (considering whether arbitrator's refusal to apply relevant statutes of limitations constituted manifest disregard of law in violation of § 52-418 [a] [4]); *Caldor, Inc.* v. *Thornton,* supra, 345–51 (adjudicating facial constitutionality of state statute upon determination that arbitrator lacks power to render judgment on merits). We perceive nothing in the public policy exception that warrants a different standard of judicial review.

In sum, the court's experience in discerning public policy, the context in which public policy challenges typically arise, and the tradition of undertaking what in practice amounts to de novo review whenever an arbitral award falls outside the conventional rule of deference, requires that this court's admittedly strong commitment to the arbitration process must yield, when a legitimate public policy is involved, to the logic of allowing the reviewing court to ensure that the award comports with that policy.

By no means should our decision be viewed as a retreat of even one step from our position favoring arbitration as a preferred method of dispute resolution. Unlike the suggestion in the concurrence of Justice

Peters, our faith in and reliance on the arbitration process remains undiminished, and we adhere to the long-standing principle that findings of fact are ordinarily left undisturbed upon judicial review. Thus, in the present case, we defer to the arbitrator's interpretation of the agreements regarding the scope of the forfeiture upon competition provision, as well as the terms upon which postemployment benefits are offered to former employees. We conclude only that as a reviewing court, we must determine, pursuant to our plenary authority and giving appropriate deference to the arbitrator's factual conclusions, whether the forfeiture provision in question violates those policies.[8]

## C

We recognize that one of our sister states previously has declined to review de novo an arbitrator's interpretation and application of one of the ethics rules.[9] Our

[8] The concurring opinion by Justice Peters mischaracterizes our holding as one which does "not depend upon facts found by the arbitrator." We state plainly that in undertaking de novo review of the plaintiff's public policy claim, we "defer to the arbitrator's interpretation of the agreements . . . ." We therefore do not substitute our own reading of the contract terms for that of the arbitrator, but intervene only to the extent that those terms, as interpreted, violate a clearly established public policy. Our approach is consistent with a well established line of precedent that excepts public policy questions from the traditional rule of deference to arbitral authority. See, e.g., *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, supra, 248 Conn. 126–27; *Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 340–41; *Board of Trustees* v. *Federation of Technical College Teachers*, 179 Conn. 184, 195–96 and n.6, 425 A.2d 1247 (1979). Moreover, Justice Peters' concurrence mischaracterizes our holding as resting on the judiciary's authority to prescribe professional rules of conduct, and thus has "difficulty in finding a basis for the distinction" between our rule of plenary review and the deferential standard of review traditionally applied to legislative enactments pertaining to the same subject matter. We do not so limit our holding, but rather, conclude that de novo review is warranted whenever a challenge to an arbitral award raises a colorable public policy claim. Accordingly, we decline to address Justice Peters' concern.

[9] According to the concurring opinion of Justice Peters, several states have declined to review public policy challenges to arbitration awards de novo. We read the cases offered in support of this proposition as suggesting,

examination of that decision, however, does not persuade us to follow its lead.

Recently, the Supreme Court of New Jersey had the opportunity to consider the same issue as the one before us. In *Weiss* v. *Carpenter, Bennett & Morrissey*, 143 N.J. 420, 442–43, 672 A.2d 1132 (1996), the court decided the proper level of judicial review of arbitration awards involving application of rule 5.6 of the New Jersey Rules of Professional Conduct, a rule substantively identical to our own rule 5.6. The court stated: "Assuming that the arbitrator's award accurately has identified, defined, and attempted to vindicate the pertinent public policy, courts should not disturb the award merely because of

not that public policy challenges are reviewed deferentially, but, rather, that a reviewing court will not interfere with an arbitration award absent a clear breach of public policy. In each case, the court examined whether the plaintiff had invoked a legitimate public policy mandate, but ultimately upheld the award in light of its own conclusion that the award did not contravene a claimed public policy. See *Bureau of Special Investigations* v. *Coalition of Public Safety*, 430 Mass. 601, 605, 722 N.E.2d 441 (2000) (declining to overturn arbitration award reinstating employees discharged for improperly accessing tax information on ground that "no public policy 'require[s] dismissal' of employees who access confidential tax records without authorization"); *New York State Correctional Officers & Police Benevolent Assn., Inc.* v. *New York*, 94 N.Y.2d 321, 328, 726 N.E.2d 462, 704 N.Y.S.2d 910 (1999) (public policy not implicated wherein arbitrator's reinstatement of correctional officer "does not violate a well-defined constitutional, statutory or common law" mandate); *St. Paul* v. *AFSCME Council 14, Local 2508*, 567 N.W.2d 524, 527 (Minn. App. 1997) (arbitrator's interpretation of contract as preventing city from imposing employee residency requirement does not compel breach of local ordinance, and thus does not violate public policy); *International Assn. of Firefighters, Local 1619* v. *Prince George's County*, 74 Md. App. 438, 449–50, 538 A.2d 329 (1988) (misdemeanor conviction arising out of off-duty conduct does not compel discharge, and thus, firefighter's conditional reinstatement to employment does not violate public policy).

In addition, we find Justice Peters' reliance on *Pennsylvania State Police* v. *Pennsylvania State Troopers Assn.*, 698 A.2d 688, 689 (Pa. Commw. 1997), aff'd, 1999 Pa. Lexis 3531, unpersuasive. In that case, the court was bound by the requirements of a state statute that specifically precluded de novo review of arbitral awards regarding police and fire personnel. Id., 689 n.3. No such statute is involved in this case.

disagreements with arbitral fact findings or because the arbitrator's application of the public-policy principles to the underlying facts is imperfect." Id., 443. The court declared that if the correctness of the arbitral award is "reasonably debatable, judicial intervention is unwarranted." Id. The court further stated that "[t]he judiciary's duty to provide an enhanced level of review of such arbitration awards is discharged by a careful scrutiny of the award, in the context of the underlying public policy, to verify that the interests and objectives to be served by the public policy are not frustrated and thwarted by the arbitral award."[10] Id.

The *Weiss* court recognized that "an enhanced level of review" of arbitration awards is appropriate when public policy is implicated, yet chose not to disturb arbitral awards if their correctness is "reasonably debatable . . . ." Id. We choose to draw the line in a different place, however, including in our category of arbitral awards subject to de novo review those that potentially undermine a legitimate public policy objective.[11] Con-

---

[10] The *Weiss* court also stated that its disposition of the appeal "necessarily reflects [its] full agreement with the Appellate Division's conclusion that [a] practicing lawyer sitting as an arbitrator . . . is obligated and competent to determine the meaning and validity of [an agreement's] provisions in light of the Rules of Professional Conduct as interpreted by our courts." (Internal quotation marks omitted.) *Weiss* v. *Carpenter, Bennett & Morrissey*, supra, 143 N.J. 440. We note, however, that under our statutes, there is no requirement that an arbitrator be a practicing lawyer. Moreover, arbitrators may be called upon to interpret rules not yet interpreted by our courts. Rather than consider in each case whether a particular arbitrator is qualified to interpret a particular rule of ethics, we prefer to allow our courts to review arbitrators' decisions de novo, thus ensuring, to the extent possible, that the public policy of this state is given the proper interpretation and application.

[11] We note that in declining to interfere with the arbitrator's application of New Jersey's rule 5.6, the court in *Weiss* did not erect a per se bar against heightened review. In fact, in some instances, the New Jersey Supreme Court has undertaken a more exacting review, such as when it considers an award to implicate its supervisory authority. In *Faherty* v. *Faherty*, 97 N.J. 99, 477 A.2d 1257 (1984), for example, the court declined to defer to the arbitrator's conclusions when an award affecting child support was questioned on public policy grounds. The court explained that under the doctrine of parens patriae, "[c]hildren's maintenance, custody-visitation, and

firming an award that raises a legitimate public policy concern but which is merely reasonably debatable, in our view, does not provide the desired level of confidence in the integrity of our system of justice. As noted previously, we have balanced the competing interests. Placing our policy favoring arbitration on one side of the scale and our desire to ensure that the legitimate objectives of our ethics rules are given proper effect on the other, the scales tip in favor of de novo review of an arbitral award in the limited circumstance in which an arbitrator has been called upon to apply a rule of conduct that implicates a legitimate public policy.[12]

## D

In assessing the arbitrator's award, the trial court fashioned an intermediate standard of review, stating

overall best interests have always been subject to the close scrutiny and supervision of the courts despite any agreements to the contrary." Id., 108. Consequently, New Jersey courts have accepted a "non-delegable, special supervisory function in [the] area of child support" that warrants de novo review whenever an arbitrator's award of child support could adversely affect the substantial best interests of the child. Id., 109; see also *Miller* v. *Miller*, 423 Pa. Super. 162, 172, 620 A.2d 1161 (1993) (trial court, not bound by arbitrator's child custody determination, must ascertain whether award is "adverse to the best interests of the children"). While we base our holding in this case on a different principle than did the court in *Weiss*, we draw support from *Faherty* and *Miller* for the principle that a heightened standard of review is appropriate, at least in certain instances, when an arbitration award implicates a legitimate public policy.

[12] The defendants suggest that by applying de novo review to an arbitrator's application of the ethics rules, we unwittingly open the floodgates of litigation to any party seeking to vacate an arbitration award that involves application of any one of the rules. The defendants point specifically to rule 1.5 of the Rules of Professional Conduct and argue that, as a consequence of a rule favoring de novo review, fee disputes, although typically resolved through arbitration, will be resolved only after judicial review of the arbitrator's decision. The inquiry into the "reasonableness" of attorney's fees under rule 1.5, however, although legal in nature, is intensely factual in application and as stated previously, we do not digress from the principle of deference to an arbitrator's findings of fact. Additionally, it is doubtful that such an issue implicates a legitimate public policy. Therefore, in the context of a dispute involving rule 1.5, we would be bound to uphold an arbitrator's award if it was based upon reasonable factual findings. Consequently, we consider the defendants' concerns to be unfounded.

that "[t]he public policy exception to arbitral authority should be narrowly construed and a court's refusal to enforce an arbitrator's interpretation of [an employment agreement] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant. . . . *Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 340 . . . . [T]he appropriate standard of review requires the court to review carefully the arbitration panel's award in the context of the underlying public policy, and if the panel has identified, defined and attempted to vindicate pertinent public policy the court should not disturb the award merely because the award is imperfect, or because the award's resolution of the public policy in question is reasonably debatable." (Citations omitted; internal quotation marks omitted.)

The trial court concluded that "[s]ince the public policy exception must be narrowly construed, giving great deference to the arbitrator's decision, the award should be upheld." As we have held, de novo review is the proper standard of judicial review of arbitral awards involving interpretation of rule 5.6. Accordingly, we hold that the trial court improperly applied a less searching standard.

## II

We must next determine the precise public policy embodied in rule 5.6, and whether, as a matter of law, enforcement of the noncompetition provision, as interpreted by the arbitrator, violates that public policy. According to the plaintiff, the objective of rule 5.6 is to ensure that clients enjoy an unfettered right to select counsel of their choice. The plaintiff admits that the appellate courts in this state have yet to consider the public policy implications of rule 5.6. He nonetheless relies on the public policy mandate allegedly expressed in the rule's official comment, as well as decisions from

other jurisdictions wherein courts have cited the need to preserve client freedom of choice as the primary consideration underlying the prohibition on future practice restrictions.

Specifically, the plaintiff contends that the public policy favoring client choice is given effect only if the term "retirement" as used in rule 5.6 denotes the complete cessation of practice. He argues that unless an attorney already is unavailable to provide representation by virtue of the attorney's full retirement, a noncompetition clause will have the effect of dissuading that attorney from taking on new clients. Therefore, the plaintiff maintains, public policy dictates that only those benefits made available to an attorney who withdraws from practice, without regard to territory or duration, properly qualify under the retirement benefits exception. According to the plaintiff, by selectively withholding compensation from an attorney who, upon departure, engages in local competitive practice, the provision has the improper effect of forcing an attorney to choose between significant compensation and continued service to clients. The plaintiff maintains, therefore, that the arbitration award upholding that provision contravenes public policy.

The defendants assert that because there is no precedent interpreting the retirement benefits exception to require the complete cessation of practice, the plaintiff cannot demonstrate that enforcement of the noncompetition provision violates an explicit public policy that is well-defined and dominant. Accordingly, the defendants argue that there is no basis for vacating the arbitrator's award. Although we agree with the plaintiff that rule 5.6 embodies, in part, a public policy favoring clients' access to an attorney of their choice, we reject the argument that application of a forfeiture provision violates that policy when applied to postemployment

benefits that are not conditioned on the absolute cessation of practice.

### A

Although in this case we apply de novo review to the arbitrator's decision that the forfeiture upon competition provision does not violate the public policy embodied in rule 5.6, the narrowness of the public policy exception continues to be in force. Therefore, in light of the exceedingly narrow scope of the public policy limitation on an arbitrator's authority, for the plaintiff to prevail on this claim, he must demonstrate that enforcement of the forfeiture upon competition provision clearly contravenes an established and dominant public policy. See *Garrity* v. *McCaskey*, supra, 223 Conn. 7; *Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 339–40. In conducting this inquiry, we focus on the purpose of the rule, its express language, and the manner in which courts in other jurisdictions have applied its restriction.

As stated previously, rule 5.6 prohibits an attorney from subscribing to a restrictive practice agreement "except [one] concerning benefits upon retirement . . . ." Rules of Professional Conduct 5.6 (1). As a regulation governing attorney conduct, rule 5.6 is "conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar." Rules of Professional Conduct, preamble, p. 2. Its underlying purpose "is to ensure the freedom of clients to select counsel of their choice, despite its wording in terms of the lawyer's right to practice." *Jacob* v. *Norris, McLaughlin & Marcus*, 128 N.J. 10, 18, 607 A.2d 142 (1992). In this respect, however, the rule recognizes that financial disincentives geared toward the discontinuation of practice disserve both clients and practitioners alike. "An agreement restricting the right of partners or associates to practice after leaving a firm not only limits

their professional autonomy but also limits the freedom of clients to choose a lawyer." Rules of Professional Conduct 5.6, commentary; see also Connecticut Bar Association Committee on Professional Ethics, Informal Opinion No. 89-26 (1989) (Informal Opinion No. 89-26) (rule 5.6 serves "interests of the public in having available to them a wide choice of competing attorneys"); District of Columbia Bar Legal Ethics Committee, Opinion No. 241 (1993) (ethics rule designed "to protect the ability of clients to obtain lawyers of their own choosing and to enable lawyers to advance their careers"). As the commentators of one leading treatise elaborated, "[r]ule 5.6 (a) is designed, in part, to protect lawyers, particularly young lawyers, from bargaining away their right to open their own offices after they end an association with a firm or other legal employer. It also protects future clients against having only a restricted pool of attorneys from which to choose." 2 G. Hazard & W. Hodes, The Law of Lawyering (2d Ed. Sup. 1997) § 5.6:201, p. 824.

At the same time, the retirement benefits exception to rule 5.6 provides protection for a law firm's "legitimate interest in its own survival and economic well-being and in maintaining its clients . . . ." *Cohen* v. *Lord, Day & Lord,* 75 N.Y.2d 95, 101, 550 N.E.2d 410, 551 N.Y.S.2d 157 (1989); see also *Howard* v. *Babcock,* 6 Cal. 4th 409, 421, 863 P.2d 150, 25 Cal. Rptr. 2d 80 (1993) (recognizing commercial concerns of law practice). By exempting "retirement benefits" from the category of postemployment payments that cannot properly be forfeited upon competition, the rule enables law firms to provide members with postdeparture compensation without compromising their own financial stability. See *Donnelly* v. *Brown, Winick, Graves, Gross, Baskerville, Schoenbaum & Walker, P.L.C.,* 599 N.W.2d 677, 681 (Iowa 1999) ("[t]here is no doubt that the Rule is designed to permit attorneys to have retirement plans

that have noncompetition conditions—there is simply no other explanation for the exception to the Rule" [internal quotation marks omitted]). It would be illogical to expect law firms to pay out large sums of cash to departing lawyers while fearing that their cash flow will be threatened by competing lawyers and the loss of potential clients. Implicit in the retirement benefits exception, therefore, is the notion that the public's interest in fostering liberal competition among practitioners must be balanced against a law firm's interest in maintaining a steady income flow for the purpose of providing former members with substantial remuneration upon retirement.

B

Keeping in mind the public policy embodied in rule 5.6, we address the plaintiff's claim that the arbitrator violated that policy by enforcing the forfeiture provision in this case as it pertains to benefits that do not require the absolute cessation of practice.[13] We look first to

[13] The concurring opinions of Chief Justice McDonald and Justice Peters contend that the plaintiff cannot secure judicial review of his public policy claim in the absence of some offer of proof of an actual impact of the noncompetition clause on potential clients of the plaintiff. In other words, the concurring justices would hold that before we properly can entertain a public policy challenge to an arbitral award, the plaintiff must demonstrate that some action taken by the defendant had a direct impact on the particular public policy at issue. Under the circumstances of this case, the concurring justices would require a showing that the plaintiff had in fact declined to represent potential clients to avoid enforcement of the noncompetition provision by the defendants.

Our precedent does not compel such a showing. For example, in *Watertown Police Union, Local 541* v. *Watertown*, supra, 210 Conn. 341, the plaintiff union claimed that the discharge of a probationary recruit for disobeying a supervisor's order to refrain from conducting routine traffic stops violated the public policy of affording law enforcement officers discretion in enforcing traffic safety regulations. We entertained that challenge even though the recruit undertook a course of action consistent with the claimed public policy at issue. In fact, the recruit's action effectively nullified any adverse impact on the public policy implicated in the supervisor's command. The recruit was nonetheless aggrieved because his discharge had been predicated on the breach of a departmental command that, according to the union, violated public policy. Similarly, we entertain the plaintiff's

whether the public policy requirement advanced by the plaintiff inheres in the rule itself.

Nothing in the rule itself expressly addresses the effect on a forfeiture provision of postemployment benefits that are made available on conditions less than full retirement. The rule requires only that an attorney be retired; it does not expressly define the elements of retirement. Indeed, the word retirement is susceptible to varying meanings depending on the context in which it is used. In one sense, retirement "connotes a permanent withdrawal from gainful employment altogether, namely, [t]o give up business or public life and live on one's income, savings, or pension. Webster's II New College Dictionary 947 (1995). However, retire may also refer simply to withdrawal from a particular occupation or even from a particular position within an occupation. See Webster's Third New International Dictionary 1939 (1981)." (Internal quotation marks omitted.) *Neuman* v. *Akman*, 715 A.2d 127, 131 (D.C. 1998). At the same time, the wording of the exception permits the imposition of "a restriction on future practice as a condition of payment of retirement benefits—not on the lawyer's full retirement." *Donnelly* v. *Brown, Winick, Graves, Gross, Baskerville, Schoenbaum & Walker, P.L.C.,* supra, 599 N.W.2d 680. In other words, although the exception allows a firm to withhold retirement benefits from an attorney who engages in competitive practice,

challenge in this case not because of any measurable impact on client choice, but because the plaintiff has forfeited benefits, and thereby has been aggrieved, pursuant to the enforcement of a noncompetition provision that is claimed to be incompatible with the public policy at issue.

In addition, the concurring justices' approach would require, in effect, that only those individuals who choose to comply with the agreement, that is, who refrain from practicing law within the proscribed region, could commence an action for postemployment benefits, and only after they had rejected a potential client. Under that scenario, however, the compliant attorney would receive the very benefits that would otherwise be the subject of the arbitration. We decline to sanction such an anomalous result.

the rule does not force the attorney to abandon the profession altogether in order to be eligible to collect the benefits. The rule itself, therefore, does not dictate unequivocally that forfeiture restrictions are permitted only as applied to benefits that vest on the occasion of a member's unqualified retirement.

C

We next examine whether any judicially prescribed notion of public policy supports the plaintiff's proposed construction of rule 5.6 that retirement means the absolute cessation of practice. The plaintiff correctly acknowledges that there is no authoritative Connecticut judicial decision interpreting rule 5.6, and therefore, he relies upon cases from other jurisdictions to advance his public policy claim. We conclude that those courts have not construed rules similar to our rule 5.6 in the manner that the plaintiff suggests.[14]

Courts in several jurisdictions have considered the scope of the retirement benefits exception under rule 5.6, or parallel ethics rules, in addressing public policy challenges to restrictive practice agreements. These courts agree that "[f]or the [ethics] rule to have meaning . . . retirement must mean something different than withdrawal from the firm. Otherwise, every termination of a relationship between law partners would be a retirement and agreements restricting the right to practice would always be allowed." *Miller* v. *Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, 457, 790 P.2d 404 (1990); see also *Neuman* v. *Akman*, supra, 715 A.2d 131 ("[i]f 'retirement' denotes simply withdrawal from the firm, then any benefit offered to withdrawing partners may ethically be held contingent upon the partner's refraining from the practice of law"); *Cohen* v. *Lord*,

---

[14] In light of our disposition of this issue, we need not address whether a uniform body of law from other jurisdictions could in fact suffice to establish the public policy of this state.

*Day & Lord*, supra, 75 N.Y.2d 100 (equating departure benefits with retirement benefits "would invert the exception into the general rule, thus significantly undermining the prohibition against restraints on lawyers practicing law"). These courts also agree that unlike mere departure compensation, benefits that qualify under the exception to rule 5.6 exhibit the objective indicia of retirement in terms of funding source, distribution period, and applicable eligibility criteria.

First, as to the source of funding, retirement benefits are generally those payable from future firm revenues. See *Neuman* v. *Akman*, supra, 715 A.2d 136 (retirement benefits come "entirely from firm profits that post-date the withdrawal of the partner"); Virginia State Bar Standing Committee on Legal Ethics, Opinion No. 880 (1987) (distinguishing "compensation already earned" from benefits funded "by the employer or partnership or third parties" that qualify under retirement benefits exception). Retirement benefits do not represent the partner's earned but uncollected income. *Anderson* v. *Aspelmeier, Fisch, Power, Warner & Engberg*, 461 N.W.2d 598, 601–602 (Iowa 1990) (payments of former partner's equity holdings do not qualify as retirement benefit); *Pettingell* v. *Morrison, Mahoney & Miller*, 426 Mass. 253, 257–58, 687 N.E.2d 1237 (1997) (distribution of acquired capital does not constitute retirement benefit); *Cohen* v. *Lord, Day & Lord*, supra, 75 N.Y.2d 100 (retirement benefits exception does not authorize forfeiture of partner's uncollected share of net profits).

Second, retirement benefits are intended to compensate for the substantial reduction of income experienced upon retirement, and are characterized, therefore, by an extended disbursement period. See *Neuman* v. *Akman*, supra, 715 A.2d 137 (distinguishing retirement benefits payable over duration of partner's lifetime from withdrawal benefits payable for two year period); *Cohen* v. *Lord, Day & Lord*, supra, 75 N.Y.2d

100 (payments did not qualify as retirement benefits because "all payments are to be made and conclude three years following withdrawal"); *Gray* v. *Martin,* supra, 63 Or. App. 181 (disbursement period of " '24 months following the effective date of withdrawal' " insufficient to qualify benefits as relating to retirement).

Third, and most important, the receipt of postemployment benefits is tied to the actual occasion of retirement when eligibility is conditioned on minimum age and length of service requirements. See *Neuman* v. *Akman,* supra, 715 A.2d 136–37 (lifetime payments to former partners who satisfy age and tenure requirements qualify as true retirement benefits); *Donnelly* v. *Brown, Winick, Graves, Gross, Baskerville, Schoenbaum & Walker, P.L.C.,* supra, 599 N.W.2d 682 (policy of distributing benefits after "ten years of service and sixty years of age or twenty-five years of service . . . clearly qualifies as a retirement plan"); *Miller* v. *Foulston, Siefkin, Powers & Eberhardt,* supra, 246 Kan. 458 (payments made to former partners who satisfy age, longevity or disability requirements "[f]it squarely within the exception of [the ethics rule]"). Significantly, each of these authorities has applied the retirement benefits exception on conditions less than full retirement, thereby implicitly rejecting the notion that public policy requires the complete cessation of practice in order to qualify under the exception to rule 5.6.

At least one court has confronted and expressly rejected the very claim that the plaintiff now advances on appeal. In *Donnelly* v. *Brown, Winick, Graves, Gross, Baskerville, Schoenbaum & Walker, P.L.C.,* supra, 599 N.W.2d 680, the Supreme Court of Iowa declined to read into the retirement benefits exception a requirement that payments be made available only upon the express condition that the attorney completely withdraw from practice. *Donnelly* involved a law firm's operating agreement that provided for the distribution

of postemployment compensation upon a partner's "retirement from [the] practice of law either after age 60 with at least 10 years service to the firm, or after at least 25 years of service with the firm . . . regardless of attained age . . . ." (Internal quotation marks omitted.) Id., 678–79. For the purposes of eligibility, the agreement defined "retirement from [the] practice of law" as the termination of practice "within the State of Iowa." (Internal quotation marks omitted.) Id., 679. The plaintiff challenged the territorial restriction as an improper covenant not to compete under DR rule 2-108 (A) of Iowa's Code of Professional Responsibility,[15] that did not qualify under the retirement benefits exception. According to the plaintiff in *Donnelly*, the rule required "full retirement before a withdrawing lawyer may be restricted in his future practice," but that under the firm's operating agreement, "a withdrawing lawyer may enter private practice in another state . . . and still draw retirement benefits." Id., 680. The court agreed that "the restriction on [the plaintiff's] future practice is a covenant not to compete" that interferes with the ethics rule's primary objective of promoting client choice. Id. The court nonetheless upheld that restriction pursuant to the retirement benefits exception. Id.

As to the applicability of the exception, the court expressly held that "the exception . . . applies when the parties have agreed . . . to provide retirement benefits under conditions less than full retirement." Id. Significantly, the court in *Donnelly* drew support for

---

[15] The Iowa Code of Professional Responsibility, DR 2-108 (A), is substantially similar to our rule 5.6, and provides that: "A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits." (Internal quotation marks omitted.) *Donnelly* v. *Brown, Winick, Graves, Gross, Baskerville, Schoenbaum & Walker, P.L.C.*, supra, 599 N.W.2d 679.

its holding by citing with approval the rationale of the trial court in the present case that the exception to rule 5.6 permits attorneys to construct retirement plans to include noncompetition conditions. Id., 680–81. As to the benefits involved therein, the court in *Donnelly* concluded that because eligibility had been determined pursuant to "a bona fide retirement plan" characterized by definitive age and longevity requirements, the post-employment payments "clearly qualifie[d]" under the retirement benefits exception, and thus, were permissibly "conditioned on [the plaintiff] remaining out of the private practice of law in Iowa." Id., 682.

### D

The ethics committee of the Connecticut Bar Association also has concluded that under rule 5.6, "benefits upon retirement" include postemployment revenues that become payable on conditions less than full retirement, and that as applied to such benefits, a forfeiture upon competition provision does not violate public policy.[16] In Informal Opinion No. 89-26, supra, the committee defined retirement to mean the "cessation of private law practice with an intention, and the expectation by others, that the cessation will be permanent." Under that definition, a partnership provision that conditioned the receipt of postemployment revenues on a former partner's agreement not to practice law within a proscribed geographical region was impermissible insofar as it pertained to payments made to each departing partner, regardless of their age or tenure of service with the firm. See id. The committee expressly adopted the reasoning of the Oregon Court of Appeals in *Gray* v. *Martin*, supra, 63 Or. App. 181–82, wherein the court

---

[16] We acknowledge that the traditional rule of deference to an administrative interpretation does not apply where the statute or regulation at issue has not previously been subjected to judicial scrutiny. See *Biasetti* v. *Stamford*, 250 Conn. 65, 71, 735 A.2d 321 (1999). Nonetheless, we consider the committee's interpretation of our rule instructive to our analysis.

held on analogous facts that benefits payable to "[a]ny partner" who satisfied a territorial practice restriction did not constitute retirement benefits. See also *Spiegel* v. *Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 531 (Tenn. 1991) (compensation payable to "any shareholder leaving the firm" was not in the "nature of a condition to payment of retirement benefits" [internal quotation marks omitted]).

Thereafter, in a subsequent opinion, the committee drew on its previous definition of retirement and upheld a law firm agreement that conditioned eligibility for postemployment compensation on compliance with a geographical practice restriction that lasted for a period of up to seven years. Connecticut Bar Association Committee of Professional Ethics, Informal Opinion No. 90-21 (1990) (Informal Opinion No. 90-21). The proposed agreement differed from that involved in Informal Opinion No. 89-26, supra, in that only partners who withdrew from the firm on or after their sixty-second birthday, or by reason of death, permanent disability or discharge without cause, were eligible to receive the additional compensation. The committee characterized the proposed economic disincentive in Informal Opinion No. 89-26, supra, as the "functional equivalent" to a practice restriction proscribed by rule 5.6, but determined that the restriction fell within the retirement benefits exception. The committee reasoned in Informal Opinion No. 90-21, supra, that "the two instances in which [the firm] seek[s] to condition receipt of deferred compensation upon an agreement restricting the employee's right to practice—withdrawal on or after the 62nd birthday or permanent disability—are instances in which it may legitimately be inferred that the lawyer intends to retire from the practice of law." That a former partner might commence practice outside of the proscribed territory immediately upon departure from the firm, or within that territory after seven years had passed without

affecting their payout rights, had no bearing on the character of the benefits in question or the public policy embodied in rule 5.6. See id.; see also *Neuman* v. *Akman*, supra, 715 A.2d 137 (scope of restriction "does not, in our view, significantly change the character of the benefit in any overall sense").

E

The plaintiff points to no statute or rule of conduct that requires an attorney to abandon completely the practice of law before receiving retirement benefits. As stated previously, rule 5.6 does not define the elements of retirement but, rather, provides only that retirement benefits are exempt from the general prohibition on practice restraints. Moreover, our recitation of the previously cited authorities demonstrates that courts in other jurisdictions do not treat the complete cessation of practice as a condition on eligibility that is necessary to implement the policy mandate of rule 5.6. In the absence of a clear contrary policy statement by the legislature or the courts empowered to govern attorney conduct in this state, we conclude that the public policy embodied in rule 5.6 does not require that eligibility for retirement benefits be conditioned on the absolute cessation of practice. See *Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 343 (law enforcement official's selective enforcement order does not violate public policy to "protect the community" where no legislative or administrative enactment requires mandatory enforcement); *New Haven* v. *AFS-CME, Council 15, Local 530*, supra, 208 Conn. 418 (arbitration award of back pay to convicted police officer does not conflict with public policy of statute that mandates discharge but does not address effect of conviction on renumeration).

Although the plaintiff fails to present a legal justification for setting aside the arbitrator's award, we note

for the sake of completeness that as a practical matter, his proposed construction of rule 5.6 would have the perverse effect of undermining the very considerations that he advances in support of his public policy claim. If, for example, retirement benefits were linked to the unqualified cessation of practice, rule 5.6 would provide an attorney with an incentive to abandon the profession entirely so as to preserve eligibility for benefits. Under that scenario, the attorney's services would be wholly out of the reach of any client. In addition, the plaintiff's construction of the rule would discourage lawyer mobility by providing an incentive for an attorney to remain with a single firm until that attorney decides to abandon the profession. Moreover, under the plaintiff's construction, in order to establish eligibility for benefits, an attorney would be required to refrain from even noncompetitive practice in a territory outside of the firm's practice area. In the absence of a legitimate business concern, however, a law firm lacks both a need and justification for imposing such restrictions on the attorney's practice under rule 5.6.

F

Turning to the facts of the present case, we conclude that the arbitrator properly determined that enforcement of the forfeiture provision, as applied to the 2x benefits, does not undermine the public policy embodied in rule 5.6. As stated previously, the arbitrator concluded that the supplemental benefits qualify under the retirement benefits exception based in large part on the fact that only partners who satisfy minimum age and longevity requirements qualify for payment. This eligibility criteria "guarantees that partners normally are at or nearing the age at which many Americans typically cease employment." *Neuman* v. *Akman*, supra, 715 A.2d 136; see also Informal Opinion No. 90-21, supra (referring to age as one of the "occasions of retirement"). Moreover, even as to those partners who

satisfy the minimum age requirements, actual payment of benefits does not commence until the partner reaches the age of sixty.

The arbitrator also rejected the plaintiff's assertion that the 2x benefits represent the former partners' equity interest in the firm's assets. As a factual matter, the partnership agreement expressly provides that post-employment benefits are generated entirely from "future income" that postdate a partner's withdrawal. Under the employment agreements, therefore, the plaintiff will recover any "contributions, loans or capital account balances" as well as the value of his shares of partnership stock, regardless of his choice to continue practicing law in competition with the firm. "It is only future firm revenues that [the plaintiff] will be deprived of, and only because he is at least potentially competing with the firm and effecting a depression of those revenues." *Neuman* v. *Akman*, supra, 715 A.2d 136.

Finally, that the 2x benefits are payable over a ten year period indicates the firm's intent to sustain former members for the long term in the absence of a regular salary. Although benefits are not payable for the partner's remaining lifetime, they commence for a significant period only after the attorney reaches sixty years of age. Any unpaid installments upon the partner's death become payable to a designated beneficiary or to the retired partner's estate. As the arbitrator noted, these payout terms are characteristic of many retirement benefits plans and support the conclusion that the payments are in fact made for the purpose of funding a retirement.

The plaintiff did not challenge the correctness of the arbitrator's factual findings in his motion to vacate, nor does he challenge them on appeal. The plaintiff contends only that a forfeiture provision, as applied to benefits offered on these terms, violates the public pol-

icy embodied in rule 5.6. We reject that contention. Although we agree with the trial court that any construction of the retirement benefits exception that permits postemployment benefits to be conditioned on a noncompetition agreement will have some effect on client choice, that the anticompetitive effect of the practice restriction in this case is limited is demonstrated by the fact that a retiring partner may resume the practice of law outside of the proscribed counties immediately upon withdrawal, or anywhere after a three year period without losing rights under the plan. See *Neuman* v. *Akman*, supra, 715 A.2d 136 n.13 (emphasizing minimal anticompetitive impact of two year practice restriction). Moreover, "the various indicia of 'benefits upon retirement' as set out in the above authorities are present here and operate to validate the [forfeiture provision as applied to the 2x benefits] in the respect challenged here." Id., 137.

Consequently, we conclude that there is no merit to the plaintiff's argument that the arbitrator's enforcement of the agreement's forfeiture provision, as applied to the 2x benefits, violates public policy. We caution that scrutiny is warranted of purported retirement benefits that may be forfeited upon continued practice following withdrawal from a firm. See id. We are satisfied, however, that the agreement's noncompetition clause in this case, as applied to the 2x benefits, does not interfere significantly with client choice or attorney mobility to the extent that it rises to the status of a clear violation of an established public policy. Accordingly, we decline to vacate the award.

### III

We next address the plaintiff's claim that because the application of the savings clause to the 1x benefits violates the public policy underlying rule 5.6, it was improper for the trial court to confirm that portion

of the arbitral award pertaining to those benefits. We conclude that application of the savings clause does not violate public policy, and therefore, the trial court's ruling on this issue was proper.

As stated previously, the agreements provide that the 1x benefits are available to a retiring partner who satisfies a four year tenure requirement regardless of the partner's age. Based upon that fact, the arbitrator concluded that the basic benefits, as set out in the agreements, "[do] not qualify as a retirement benefit under currently accepted judicial interpretations" of rule 5.6, and consequently, cannot be subject to forfeiture upon competition without undermining the policy objectives of rule 5.6. Recognizing this deficiency, the arbitrator modified the 1x benefits, pursuant to his authority under the savings provision, to make them available on the same terms and conditions as the 2x benefits. Our conclusion that enforcement of the forfeiture provision as to the 2x benefits does not violate public policy necessarily resolves, in the defendants' favor, the question of whether the requirements to obtain the 1x benefits, as modified by the arbitrator, violate public policy. The question necessarily before us then is whether the arbitration award with respect to the 1x benefits nevertheless must be vacated because invocation of the savings clause *itself* violates public policy.

The plaintiff contends that enforcement of the savings clause undermines the public policy in favor of client choice in two respects. He recognizes that a savings provision permits an arbitrator to enforce an otherwise invalid forfeiture provision by converting nonretirement benefits into retirement benefits, instead of striking the invalid provision and ordering a firm to commence payment on the attorney's behalf. As a result, the plaintiff argues, application of the savings clause essentially creates a bar to recovery such that

an attorney has no incentive to challenge an otherwise invalid provision. In the end, therefore, he contends that preservation of a noncompetition provision via application of the savings clause has the ultimate effect of dissuading attorneys from representing new clients for fear of forfeiting benefits. Additionally, the plaintiff argues that enforcement of the savings clause encourages violations of the ethics rules because law firms, rather than concerning themselves with drafting ethically permissible restrictive covenants, will merely incorporate a savings provision into their agreements, confident that an attorney is unlikely to challenge the provision. Accordingly, the plaintiff contends that "the savings clause of the forfeiture provision is as contrary to . . . public policy as the forfeiture provision itself," and that the trial court should have vacated that portion of the arbitration award pertaining to the 1x benefits.

The plaintiff points to no authority, in this state or otherwise, in which a court has voided an arbitral savings provision as against public policy. In support of his claim that public policy forbids the reformation of a retirement benefits provision, the plaintiff cites to several cases in other jurisdictions wherein courts have severed invalid forfeiture provisions from a law firm's employment agreement, and awarded retirement benefits to the withdrawing attorney.[17] The cases cited by the plaintiff, however, implicate a court's remedial jurisdiction, which is limited to severing an improper contractual provision in order to save the validity of the agreement as a whole. None of those cases involves

---

[17] See *Pierce* v. *Hand, Arendall, Bedsole, Greaves & Johnston,* 678 So. 2d 765 (Ala. 1996); *Stevens* v. *Rooks, Pitts & Poust,* 289 Ill. App. 3d 991, 682 N.W.2d 1125, appeal denied, 175 Ill. 2d 555, 689 N.E.2d 1147 (1997); *Anderson* v. *Aspelmeier, Fisch, Power, Warner & Engberg,* supra, 461 N.W.2d 598; *Pettingell* v. *Morrison, Mahoney & Miller,* supra, 426 Mass. 253; *Jacob* v. *Norris, McLaughlin & Marcus,* supra, 128 N.J. 10; *Cohen* v. *Lord, Day & Lord,* supra, 75 N.Y.2d 95; *Spiegel* v. *Thomas, Mann & Smith, P.C.,* supra, 811 S.W.2d 528.

an arbitrator's authority, pursuant to an unrestricted submission, to modify an otherwise invalid benefits provision in order to preserve the validity of that same provision.

The plaintiff's claim that the trial court should have vacated on public policy grounds that portion of the arbitration award pertaining to the 1x benefits overlooks the fundamental distinction between judicial and arbitral authority. Unlike the limited jurisdiction of the court, "[t]he parties themselves, by the agreement of the submission, define the powers of the arbitrator. . . . The submission constitutes the charter of the entire arbitration proceedings and defines and limits the issues to be decided. . . . When the parties have agreed to a procedure and have delineated the authority of the arbitrator, they must be bound by those limits." (Citations omitted.) *Bic Pen Corp.* v. *Local No. 134*, 183 Conn. 579, 583–84, 440 A.2d 774 (1981). Thus, "[p]rivate parties may empower an arbitrator to modify their agreement . . . [even though] they cannot confer that power on a court." (Citation omitted.) *Hayes* v. *Beresford*, 184 Conn. 558, 562, 440 A.2d 224 (1981).

That the parties themselves designated the scope of arbitral authority significantly undermines the plaintiff's contention that invocation of a savings provision to modify the terms of eligibility for retirement benefits violates a clearly defined public policy mandate. Indeed, the plaintiff himself urged that the arbitration agreement be amended to include the savings provision as a means of preserving the ethical validity of the noncompetition provision as applied specifically to the 1x benefits. He presented no evidence, either at the arbitration hearing or in support of his motion to vacate, that the savings clause was the result of the parties' attempt to avoid the strictures of rule 5.6. Rather, the arbitrator specifically found that the clause represented

a good faith effort on behalf of the parties to comply with the ethics rules. As a reviewing court, we decline to cast that effort aside.

In addition, by providing the remaining partners with a mechanism to ensure enforcement of a noncompetition provision, a savings clause provision enables a law firm to continue to fund retirement payments without compromising its financial security. Without such a provision, law firms are likely to abolish such benefits rather than risk a substantial loss of revenues. Thus, striking down the savings clause would undermine the purpose of the retirement benefits exception, that is, to enable firms to provide financial support to their former partners upon retirement. See *Howard* v. *Babcock*, supra, 6 Cal. 4th 420–21; *Donnelly* v. *Brown, Winick, Graves, Gross, Baskerville, Schoenbaum & Walker, P.L.C.*, supra, 599 N.W.2d 681; *Cohen* v. *Lord, Day & Lord*, supra, 75 N.Y.2d 100–101. Moreover, we are compelled to defer to the arbitrator's factual finding that the enforcement of the savings provision, under the unique facts of this case, would have a de minimis effect on future challenges against similar provisions. As the arbitrator correctly recognized, arbitration is a private remedy that, as such, has limited precedential effect on outside litigants.[18]

In light of the foregoing, we decline to hold that the arbitrator violated well established public policy in resorting to the savings provision to bring the 1x benefits into compliance with the ethics rules. Consequently, we conclude that the trial court properly confirmed

---

[18] We note that the retirement benefits plan was terminated before this case went to arbitration largely in response to concerns that the large unfunded commitment would create a burden in future years, and in recognition that the firm's 401k plan provided an adequate vehicle through which the partners could provide for their own retirement security. Thus, the risk of future challenges against the validity of the noncompetition provision as applied to the 1x benefits effectively has been eliminated.

that portion of the arbitration award relating to the 1x benefits.

The judgment is affirmed.

In this opinion BORDEN and NORCOTT, Js., concurred.

MCDONALD, C. J., concurring. I agree with the majority's resolution of this appeal. I only wish to add that, when reviewing an award claimed to violate a clear public policy, a court is not bound by the arbitrator's conclusion that a clear public policy would not be violated by the award. Judicial review of whether an award violates public policy inherently requires a court to decide what clear public policy exists and whether the award violates that clear public policy. Absent that, there can be no meaningful judicial review.

Before such review is undertaken, as the majority states, the party alleging that an award violates public policy must make a colorable claim of such violation. In this case, the plaintiff failed to make an offer of proof to support such a claim. I agree with Justice Peters that this dispute, however described by the plaintiff, is simply a dispute about money and not about the principles of the ethical rules designed to make a lawyer's services available to clients. In these circumstances, we should be bound by the arbitrator's factual findings and uphold the arbitrator's decision.

PETERS, J., concurring in the result. I respectfully concur in the majority opinion. Although I agree with the result reached therein, I write separately because I differ from the majority on three grounds. I am persuaded that: (1) this court lacks the factual predicate to consider whether to overturn the award of the arbitrator under the circumstances of this case; (2) neither our precedents, nor those of other courts, provide any support for the proposition that all arbitral awards that

implicate matters of public policy warrant de novo judicial review; and (3) for purposes of judicial review, all arbitral awards interpreting issues of public policy should be reviewed under the same deferential standard, regardless of whether the public policy at issue emanates from rules enacted by the judiciary, or from rules enacted by the legislature.

I

It is common ground that rule 5.6 of the Rules of Professional Conduct permits the partners in a law firm to condition the availability of retirement benefits upon a departing partner's agreement to a clause limiting that partner's ability to practice in competition with his former firm.[1] In this case, there can be no possible claim that the plaintiff, Samuel V. Schoonmaker III, failed to understand the retirement benefits contract to which he had agreed, because he himself was the author of the contract.

The public policy issue raised by rule 5.6 is that restraints on competition for providing legal services might impair the access of prospective clients to the attorneys of their choice. The risk of such impairment becomes attenuated, although it does not vanish, when a former partner chooses to retire from the practice of law after a lifetime of legal service with a particular firm.

The interpretative issue before us is the validity of a provision in the retirement benefits policy that allows the fact finder, in this case the arbitrator, to reform any clause in the benefits policy that might be inconsistent

---

[1] Rule 5.6 of the Rules of Professional Conduct provides: "A lawyer shall not participate in offering or making:

"(1) A partnership or employment agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or

"(2) An agreement in which a restriction of the lawyer's right to practice is part of the settlement of a controversy between private parties."

with the public policy of rule 5.6.[2] The arbitrator concluded that the provision was valid and enforceable. The majority opinion agrees with this conclusion, although it reaches that result by reasoning to which I do not subscribe, and without the deference to the arbitrator's factual findings and legal conclusions that I believe our precedents mandate.

## II

The core of the public policy concern that rule 5.6 addresses is a potential impairment of client choice of legal services. In the present case, the arbitrator made no factual findings about any adverse effect upon the plaintiff's present or future clients that might have resulted from the plaintiff's observance of the noncompetition clause. The record reveals no relevant offer of proof by the plaintiff on that particular point. Proof might well have been difficult because, by continuing his practice privately, in violation of the restrictive covenant, the plaintiff continued to serve his clients as rule 5.6 contemplates. There is, therefore, no factual basis for the majority's lengthy inquiry into the public policy concern that rule 5.6 addresses. In the absence of some offer of proof by the plaintiff of an *actual* impact of the noncompetition clause on potential clients, the majority's reconfiguration of our traditional scope of review lacks a solid foundation.

## A

In considering the validity of noncompetition clauses in other contexts, this court repeatedly has observed that their validity is to be determined, not by the language in which they are couched, but by a factual inquiry into whether "they are reasonably limited and

---

[2] The savings clause provides in relevant part: "Any arbitrator called upon to determine the validity and effect of this Section 10 shall construe this Employment Agreement . . . so as to preserve the validity of the noncompetition condition in Section 10(a) . . . ."

fairly protect the interests of both parties." *Robert S. Weiss & Associates, Inc.* v. *Wiederlight,* 208 Conn. 525, 530, 546 A.2d 216 (1988). As a general matter, there is, therefore, no presumption that such clauses are invalid. There equally is no presumption of invalidity simply because the clause may have an adverse impact on third parties. See id., 533. In light of this court's long-standing preference for the judicial enforcement of arbitral awards that arise out of unrestricted submissions on matters expressly consigned by the parties to arbitration; see, e.g., *Watertown Police Union Local 541* v. *Watertown,* 210 Conn. 333, 338–39, 555 A.2d 406 (1989); there is no logical basis for the majority's decision to undertake de novo review of matters not even remotely implicated by the arbitrator's factual findings in this case.[3]

## B

Moreover, the failure of the majority opinion to premise its result on the facts found by the arbitrator is inconsistent with previous decisions of this court, as well as numerous decisions from other jurisdictions. The proposition that the scope of judicial review of arbitral awards is constrained by the factual findings made by the arbitrator enjoys well-nigh universal support.

Until today, deference to arbitral findings of fact has been a hallmark of judicial review of arbitration decisions in this state. Two examples of that tradition of deference are illustrative.

*O & G/O'Connell Joint Venture* v. *Chase Family Ltd. Partnership No. 3,* 203 Conn. 133, 523 A.2d 1271 (1987),

---

[3] I recognize that, on appeal, the parties have not addressed this factual lacuna in the arbitrator's findings. Nonetheless, it seems to me that the party who seeks to overturn an arbitral award cannot become the beneficiary of an absence of findings, if it was that party's burden to come forward with some evidence, before the arbitrator, to establish the underpinnings of his case.

was a commercial arbitration case in which the losing party claimed that the arbitrator's dereliction of duty had resulted in improper arbitral findings. We rejected that claim, observing, that, in numerous other Connecticut cases, "[t]his court has for many years wholeheartedly endorsed arbitration as an effective alternative method of settling disputes intended to avoid the formalities, delay, expense and vexation of ordinary litigation. . . . When arbitration is created by contract, we recognize that its autonomy can only be preserved by minimal judicial intervention." (Citations omitted; internal quotation marks omitted.) Id., 145. Especially relevant to the present case is our observation that "[t]he party challenging the award bears the burden of *producing evidence* sufficient to invalidate or avoid it . . . ." (Emphasis added.) Id., 145–46.

*Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 333, was a labor arbitration case in which the union claimed that the arbitral award upholding its member's discharge violated applicable principles of public policy. Id., 337. We rejected that claim as well. Again, we stated that "[a]n award, therefore, will normally be vacated only if it fails to conform to the submission, and the party challenging it has the burden of producing evidence sufficient to show that it does not conform to the submission." Id., 338–39. Although we recognized that public policy issues may require greater judicial scrutiny than other objections to an arbitral award, we limited such scrutiny to a determination of whether the "award clearly violates an established public policy mandate." Id., 340.

*Garrity* v. *McCaskey*, 223 Conn. 1, 612 A.2d 742 (1992), is not to the contrary. That case involved an arbitral determination that the plaintiff's securities claims were not barred by otherwise applicable state and federal statutes of limitation. The defendant urged us to overturn the award because it demonstrated "man-

ifest disregard of the applicable law." Id., 2. We declined to do so.

Our decision in *Garrity* reiterated our commitment to "undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution." Id., 4–5; see also id., 10–11. We concluded, however, that, despite this rule of deference, "an award that manifests an egregious or patently irrational application of the law is an award that should be set aside pursuant to [General Statutes] § 52-418 (a) (4) because the arbitrator has 'exceeded [his] powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.' " Id., 10. We emphasized, nonetheless, that the "manifest disregard of the law" ground for vacating an arbitration award "is narrow and should be reserved for circumstances of an arbitrator's extraordinary lack of fidelity to established legal principles." Id. We held that the party challenging the validity of the award had failed to meet his burden of demonstrating that the award reflected "an egregious or patently irrational rejection of clearly controlling legal principles." Id., 11.

The United States Supreme Court has endorsed the proposition that judicial review of arbitral awards is bounded by the fact-finding of the arbitrator. *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987), was a case in which an arbitrator overturned the discharge of an employee for possession of marijuana. In the course of upholding the arbitrator's award, the court observed that "[c]ourts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it

disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." Id., 38; see also *United States Postal Service* v. *National Assn. of Letter Carriers, AFL-CIO*, 839 F.2d 146, 149 (3d Cir. 1988) ("[c]ourts, therefore, are prohibited from second-guessing the arbitrator's fact-finding").

State courts around the country likewise have endorsed the view that the factual findings of arbitrators entrusted with consideration of an issue implicating public policy are not subject to de novo judicial review. See, e.g., *International Assn. of Firefighters, Local 1619* v. *Prince George's County*, 74 Md. App. 438, 449, 538 A.2d 329 (1988); *Bureau of Special Investigations* v. *Coalition of Public Safety*, 430 Mass. 601, 604, 722 N.E.2d 441 (2000); *St. Paul* v. *AFSCME Council 14, Local 2508*, 567 N.W.2d 524, 526–27 (Minn. App. 1997); *Weiss* v. *Carpenter, Bennett & Morrissey*, 143 N.J. 420, 428–30, 672 A.2d 1132 (1996); *New York State Correctional Officers & Police Benevolent Assn., Inc.* v. *New York*, 94 N.Y.2d 321, 326–27, 726 N.E.2d 462, 704 N.Y.S.2d 910 (1999); *Pennsylvania State Police* v. *Pennsylvania State Troopers Assn.*, 698 A.2d 688, 689 (Pa. Commw. 1997), aff'd, 1999 Pa. Lexis 3531.

## III

It may well be that the majority opinion should be read to accept the applicability of the principle of deference to arbitral awards in the ordinary judicial review case. This case, it argues, is different because, in the course of our discussion in *Garrity* v. *McCaskey*, supra, 223 Conn. 1, we recognized that, in addition to the statutory grounds for setting an arbitral award aside

that are stated in § 51-418, there are two common-law grounds for reaching such a result. Id., 6. Claims of error based on either of these common-law grounds, according to the majority opinion, should be treated like claims of egregious arbitral misconduct, which do not depend upon facts found by the arbitrator. Under the circumstances of this case, I disagree.

I do not doubt that if an arbitral award rules on the constitutionality of a statute, such an award would be outside the scope of authority of the arbitrator. *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 344, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985). Of course, such an award requires independent full-fledged judicial review. The present case does not raise any constitutional issue.

The other common-law ground is that "the award violates clear public policy; *Watertown Police Union Local 541* v. *Watertown*, [supra], 210 Conn. 339 . . . ." *Garrity* v. *McCaskey*, supra, 223 Conn. 6. It is this common-law ground that, according to the majority, warrants de novo review of the arbitral award in the present case.

The public policy ground for review of arbitral decisions arises out of the common-law principle that "a court may refuse to enforce contracts that violate law or public policy . . . [because] no court will lend its aid to one who founds a cause of action upon an immoral or illegal act . . . ." (Citations omitted.) *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, supra, 484 U.S. 42. Yet, in that very case, the United States Supreme Court concluded that federal courts were empowered to overturn an arbitrator's public policy decision only if the award violated a clearly defined, dominant and undisputed rule of law. Id., 43. It upheld an arbitral award overturning the discharge of an employee for possession of marijuana at the workplace.

Id., 45. The court observed that "[c]ourts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." Id., 38.

Although the issue of the scope of judicial review for arbitral awards that are challenged on public policy grounds is a new question for this court, state courts around the country have agreed that the awards of arbitrators entrusted with consideration of an issue implicating public policy are not subject to de novo judicial review. Each of the state cases cited previously involved claims of improper arbitral resolution of public policy issues. See *International Assn. of Firefighters, Local 1619* v. *Prince George's County*, supra, 74 Md. App. 449; *Bureau of Special Investigations* v. *Coalition of Public Safety*, supra, 430 Mass. 604; *St. Paul* v. *AFSCME Council 14, Local 2508*, supra, 567 N.W.2d 526–27; *Weiss* v. *Carpenter, Bennett & Morrissey*, supra, 143 N.J. 428–30; *New York State Correctional Officers & Police Benevolent Assn., Inc.* v. *New York*, supra, 94 N.Y.2d 326–27; *Pennsylvania State Police* v. *Pennsylvania State Troopers Assn.*, supra, 698 A.2d 689.

I would agree with the majority, nonetheless, if the submission to the arbitrator did not include the public policy issue raised on judicial review of the arbitral award. When, however, the arbitrator was entrusted with resolution of the public policy at issue, the rule should be deference to the arbitral award. Under such

circumstances, as in the present case, I am persuaded that judicial review cannot reconsider the basis on which the arbitrator rendered his award. A contrary result flies in the face of our long history of respect for the institution of peaceful resolution of disputes through arbitration.

IV

Perhaps the majority opinion should be read even more narrowly, to authorize de novo judicial review of arbitral awards implicating issues of public policy *only* when the public policy is one adopted by the judiciary. Under such circumstances, according to the majority, traditional deference toward arbitral awards must give way to the "greater expertise and knowledge" of the judiciary; page 430 of the majority opinion; to identify and apply the public policies inherent in judicially adopted rules of professional ethics. I disagree.

Because, in this day and age, the primary source of public policy is the legislature, I have difficulty in finding a basis for the distinction that the majority adopts. Even a cursory look through the General Statutes reveals numerous occasions on which the General Assembly has addressed ethical issues arising out of the conduct of professional personnel. Many statutes deal with avoidance of conflicts of interest. See, e.g., General Statutes §§ 1-86, 4b-102, 5-266a, 7-147b and 8-119zz. Others statutes require those who have a professional license to comply with the ethical standards of their professions. See, e.g., General Statutes §§ 20-74g, 20-103a and 20-196. The Connecticut Unfair Trade Practices Act; General Statutes §§ 42-110a through 42-110q; requires merchants to operate their businesses in an ethical manner. Closer to home, the judicial review council was created by the legislature to oversee the ethical conduct of the judiciary. See General Statutes §§ 51-51g through 51-51u. These statutes are indicative

of the legislature's important role in supervising ethical professional conduct.

Of equal significance, the majority's distinction proves too much. The judiciary is entrusted, not only with oversight over members of the legal profession, but with preservation and adaptation of the common law, including general principles of equity. When the legislature has not spoken, we continue to be entrusted with deciding many significant cases in contexts that implicate ethical behavior. See, e.g., *Ostrowski* v. *Avery*, 243 Conn. 355, 364–67, 703 A.2d 117 (1997) (fairness of use of corporate opportunity); *Stamford Hospital* v. *Vega*, 236 Conn. 646, 660, 674 A.2d 821 (1996) (ethical duty of hospital for patient who refuses consent to treatment); *Krawczyk* v. *Stingle*, 208 Conn. 239, 244–46, 543 A.2d 733 (1988) (duty of professional to third parties); *State ex rel. Beardsley* v. *London & Lancashire Indemnity Co.*, 124 Conn. 416, 427–28, 200 A. 567 (1938) (equitable fairness of doctrine charging third person's estate with debts of donee). If an arbitrator were to consider the applicability of such common-law precedents in making his award, would de novo review be appropriate because development of the common law rests exclusively in the "greater expertise and knowledge" of the judiciary? In light of our traditional deference to arbitral decision making, I am persuaded, therefore, that the distinction adopted by the majority is untenable. It cannot be justified either by precedent or by logic.

The circumstances of the present case underscore the point. At bottom, the dispute between the parties is nothing more than a dispute about money. To the parties, all of whom are attorneys, the issue is whether they are bound by the express terms of a retirement policy to which they wholeheartedly subscribed at an earlier time. Traditionally, contract disputes about money have been grist for the arbitral mill. In my view,

resolution of such disputes should continue to be governed by judicial deference to arbitral decision making.

I respectfully concur in the result reached by the majority opinion.