[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an affordable housing land use appeal brought under § 8-30g
of the General Statutes. At the time of the application the Connecticut Department of Housing had determined that 3.64% of New Milford's housing stock was affordable within the meaning of § 8-30g(f). The plaintiff applied for approval of a 28 lot subdivision ("Wild Acres") on 31.514 acres of land situated in the R-80 zone.[1] The subdivision plan calls for the lots varying in size from 30,000 square feet to 2.509 acres. After a duly noticed public hearing the commission denied the application. Thereafter, the plaintiff filed a modified application in an effort to respond to the commission's articulated reasons for denial. ("objections" under section 8-30g(d)). The modified application requested approval for 24 lots rather than 28. The commission denied that application also. The plaintiff has availed itself of its statutory right to appeal from both of the defendant's decisions but requests an adjudication with respect to the modified application only.
When this case was called to trial it became apparent to the court that the defendant had not had adequate opportunity to give due consideration to items which had been filed for record with the commission in insufficient time to permit fair study and assimilation prior to deliberating on and rendering its decision. Therefore, the court remanded the matter to the commission with an order to reconsider everything that was contained in the record that was filed with the court and to render a decision upon reconsideration within 60 days. The defendant completed its reconsideration and rendered its decision on October 21, 1999.
 Aggrievement
On the basis of the testimony of Janice G. Williams, a duly authorized representative of the plaintiff, the court finds that the plaintiff was the owner of the property subject to the appeal at all times from the date the application was filed to the date of trial, Goldfeld v.Planning and Zoning Commission, 3 Conn. App. 172 (1986). Moreover, the plaintiff is "a person whose affordable housing application is [has been] denied." Under § 8-30g(b) this plaintiff is statutorily aggrieved and possesses requisite standing. Pratts Corner Partnership v.Southington Planning and Zoning Commission, 9 Conn.L.Rptr. 10 at 291 (1993). As a result, the plaintiff is aggrieved for purpose of this appeal. CT Page 6355
 The Scope of Review
Notwithstanding that this is an affordable housing appeal under §8-30g the court is bound, in the course of its review, to apply traditional principles of zoning jurisprudence where appropriate. WestHartford Interfaith Coalition, Inc. v. Town Council, 228 Conn. 498
(1994).
When a zoning commission has stated its reasons, the reviewing court ought only to determine whether the assigned grounds are pertinent to the considerations which the zoning authority was required to apply, and whether they are reasonably supported by the record. First HartfordRealty Corp. v. Planning and Zoning Commission, 165 Conn. 533, 543
(1993). The action of the commission should be sustained if even one of the stated reasons is sufficient to support it. Zygmont v. Planning andZoning Commission, 152 Conn. 550, 553 (1965). The key to the application of this test is whether any one reason is pertinent to the considerations which the zoning authority was required to apply. Unlike in conventional zoning appeals, in an affordable housing appeal, the considerations which the zoning authority is required to apply are not limited to those found in § 8-2. With the enactment of § 8-30g
the legislature has created a new set of considerations which the zoning authority must apply in affordable housing cases.
The first of these considerations is found in § 8-30g(c)(1)(A) which, in shifting the burden of proof to the zoning authority, requires that the decision and the reasons cited for the decision be "supported by sufficient evidence in the record." In Kaufman v. Zoning Commission,232 Conn. 122 (1995) our Supreme Court considered for the first time the meaning of the "sufficient evidence" requirement. In construing the term, the court rejected equating that standard with the "substantial evidence" standard that ordinarily applies to zoning decisions made in an administrative capacity. Instead, the court approved a more relaxed standard that historically has applied to legislative as opposed to administrative zoning decisions. Thus, under § 8-30g(c)(1)(A) this commission's only burden is to show that the record before the commission supports [ed] the decision reached. West Hartford InterfaithCoalition, Inc. v. Town Council, supra at 513; and that the commission did not act arbitrarily, illegally or abuse of its discretion. ProtectHamden/North Haven From Excessive Traffic and Pollution, Inc. v.Planning and Zoning Commission, 220 Conn. 527, 543-544 (1991). Recently, in Christian Activities Council, Congregational v. Town Council,249 Conn. 566, 583 (1999) our Supreme Court refortified the principle that traditional zoning concepts apply to all four sub-parts of the § 8-30g(c)(1). At the same time, the court extended the reach of the CT Page 6356 "sufficient evidence" requirement to apply not only to sub-part (A) but to all sub-parts of (A) through (D). Thus initially, the scope of this court's review is to determine whether there is sufficient evidence in the record not only to support the articulated reasons (sub-part (A)) but also to support the commission's determinations made under sub parts (B), (C), (D).
While the commission assigned seven reasons for denial its counsel agrees that they may be summarized and consolidated into four: 1) denial of approval by the Inland Wetlands Commission; 2) inadequate drainage system; 3) unacceptable provision for a drain age detention basin; 4) lack of a suitable watersource. The court finds that none of these reasons is legally sufficient under any of the four sub-parts of §8-30g(c)(1).
In embarking upon its charge to vet each reason on its own merits the court as a threshold matter, should examine whether the zoning authority has demonstrated a proper understanding and acceptance of the meaning and purpose of chapter 126a entitled "Affordable Housing Land Use Appeals". In its review of the zoning authority's action the court should first determine from the record as a whole and in particular with reference to the resolution of denial whether the zoning authority manifested evident hostility to the application because it misunderstood the applicability of the statute to the municipality which it serves.
To illustrate the principle, the defendant offered reason number 3 as a justification for denial.
3. The subdivision plan does not conform to Zoning Regulations regardinglot size. The applicant's claim of exemption under Section 8-30g, whileperhaps technically defensible, has no basis in practicality. NewMilford has an adequate stock of housing that would satisfy theConnecticut General Statutes Section 8-39g definition of "affordablehousing". Harral-Michalowski Associates, Inc., in a report to theCommission dated February 10, 1997 (pages 4 through 9) states that about42% of the existing inventory of housing in New Milford is affordable atthe median income level and 35% at the 80% of median level. The factthat only 3.64% of New Milford's housing stock meets the criteria for an"affordable housing development" as defined in Connecticut GeneralStatutes Section 8-30g by virtue of being subsidized or deed restricteddoes not create a pressing need to override the town's land useregulations.
Although by October 1999 the defendant should have realized either on its own or through the advice of counsel that a subdivision which does not conform to the zoning regulations regarding lot size is not thereby CT Page 6357 disqualified from gaining approval by a planning commission, Wisniowskiv. Planning and Zoning Commission, 37 Conn. App. 303, 312 (1995), such an erroneous belief is at least arguably excusable. Rejection of an affordable housing application by a municipality which is clearly subject to the terms of chapter 126a because it already has an adequate supply of affordable housing stock, is palpably inexcusable.
New Milford's approach to evaluating the need for affordable housing based on its own concept of what existing housing stock satisfies the statutory definition of affordable was emphatically rejected by our Supreme Court in West Hartford Interfaith Coalition, Inc. v. TownCouncil, 228 Conn. 498 (1994). In that case the defendant-zoning authority argued that the trial court should have considered evidence of existing housing that did not meet the statutory definition of affordable housing but was nevertheless "affordable." In particular, the defendant argued that the trial court should have considered statistical evidence demonstrating that at the time of the plaintiff's hearing before the defendant, there were at least 60 residential units listed on the market in West Hartford for less than $147,500 and 37 housing units listed with an asking price below $99,000. Additionally, the defendant argued that the trial court should have considered evidence that the defendant's membership had personal knowledge of various efforts on the part of West Hartford to promote affordable housing in the town. In disagreeing with that argument the court stated ". . . there is no support in the statute or its legislative history for the defendant's position. Section 8-30g(a) explicitly limits the definition of `affordable housing' to `assisted housing' or deed restricted housing. Further, § 8-30g(f) and (g) provide specific exemptions from the statute's appeal procedure. Because the `evidence' offered by the defendant does not comport with the statutory definition of `affordable housing' it satisfies neither statutory exemption. Consequently, when weighing the need for affordable housing, the trial court correctly refused to consider the defendant's evidence of low cost housing and of private efforts to encourage its development." Id. at 520.
In this case the defendant has chosen to disavow § 8-30g because in New Milford the statute "has no basis in practicality. " In other words, the commission has deliberately chosen to exempt itself from the application of § 8-30g based upon a 1997 study[2] which concludes that about 42% of New Milford's housing inventory meets affordable income levels. This self proclaimed exemption from the operation of § 8-30g ignores totally the requirement that qualified affordable housing be either assisted or restricted. It is also noted that New Milford has no affordable housing regulations as such. Instead, it has an undefined density bonus provision for affordable housing. The commission is under a statutory mandate imposed by § 8-2 (a) of the CT Page 6358 General Statutes to "promote housing choice and economic diversity in housing, including housing for both low and moderate income households." New Milford's approach to fulfillment of that mandate leads inevitably to the perception that the commission's denial was motivated by some improper, exclusionary purpose based on economic status, national origin or perhaps even race. Thus, heightened scrutiny[3] should be given to each reason to assure that the reasons are not really pretextual.[4]
Under a heightened scrutiny of test, the record must be examined carefully to find sufficient evidence to support the commission's claim that the reasons are not in fact pretextual. Heller v. Doe,125 L.Ed.2d 257 (1993).
Recently, our Supreme Court has recognized the appropriateness of an "enhanced level of review" of arbitration awards which implicate a legitimate public policy. Schoonmaker v. Cummings and Lockwood ofConnecticut, P.C., 252 Conn. 416 (2000). By its very terms, § 8-30g
implicates "substantial public interests" which land use authorities are bound to consider, protect and balance against the need for affordable housing in their communities. Christian Activities Council,Congregational v. Town Council, 249 Conn. 566, 599 (1999).
Notwithstanding that § 8-30g(c) is limited to protecting local public interests and filling local housing needs, providing affordable housing for persons of low and moderate income is a matter of strong statewide concern that must be recognized as reflecting an important public policy. See, e.g. chapters 133, 136 and 137a of the General Statutes and the report and recommendations of the Blue Ribbon Commission On Housing to the Governor and General Assembly dated February 1, 1989. Finally, the Supreme Court itself has recognized that the compelling public policy of the statute is "to encourage and facilitate the much needed development of affordable housing throughoutthe state. (Emphasis added.) West Hartford Interfaith Coalition, Inc. v.Town Council, supra at 511.
The court now turns to the individual reasons assigned by the defendant for the denial.
First Reason. Denial by the Inland Wetlands Commission (Reason #1).
As a preliminary matter it is noted that while the commission briefed this issue in its original trial brief it makes no mention of it in its supplemental brief. This very likely is because on remand the unanswered questions which form the basis for the wetlands denial were many of the same questions which the commission complained were never answered by the plaintiff on remand. As stated above, the purpose of the remand was to enable the defendant to consider the answers offered to these CT Page 6359 questions. Nevertheless, the court will not deem this issue to be abandoned.
Section 8-26 of the General Statutes prohibited the defendant from rendering a decision until the wetland's commission had "submitted to it a report with its formal decision". While a planning commission may have authority to deny approval of a subdivision solely because the subdivision was disapproved by the wetlands commission, Arway v. Bloom,29 Conn. App. 469, 478 (1992), under § 8-30g the decision and the report which presumably supports it must be based on a substantial public interest or interests in health, safety or other legally cognizable matters which clearly outweigh the need for affordable housing. There is nothing in the record to indicate that the defendant deemed any or all of the reasons for denial assigned by the wetlands commission to constitute substantial public interests needing protection. The need for identification of the specific public interests sought to be protected was pronounced by the Supreme Court in Christian ActivitiesCouncil, Congregational v. Town Council, supra at 577. In setting forth this requirement the court recognized the possibility that failure to do so might expose the zoning authority to the charge of pretextual conduct. With regard to this reason the defendant failed to articulate the public interest which it sought to protect but merely acceeded to the denial of approval by the wetland's commission.[5] Such action is not only suspiciously pretextual but abdicates the defendant's statutory responsibility under § 8-30g.
Second Reason. Inadequate Drainage System (Reason #5)
This reason is predicated primarily on the failure or unwillingness of the plaintiff to comply with certain specific requirements laid down by the town engineer, Anthony Iadarola. There is no evidence in the record to support the commission's claim that the applicant refused or neglected to comply. The commission makes reference to Iadarola's letters of July 17, 1997 (Record #20) and October 2, 1997 (Record #49). While according to Mr. Iadarola's letters certain significant engineering changes had to be made to the drainage plan and other issues had to be resolved, Iadarola stated in the July 17 letter that overall, the design engineer has done a wonderful job with all of the concerns addressed in my March 16, 1997 letter". (Record #14). Moreover, his letter of October 2 indicates clearly the plaintiff's willingness to comply with all of Mr. Iadarola's requirements. There is no basis in the record to support this reason and therefore it is lacking in sufficient evidence.
The commission has focused on certain points made in these letters which it claims remain unresolved. CT Page 6360
 Item #5 "The plaintiff must submit a detail for the grass drainage swale showing dimensions". (Record #49). A detail is nothing more than a drawing prepared by an engineer showing a section of the swale with dimensions. Webster's New World Dictionary, 1979, p. 384.
 Such a presentation is a routine act in the construction business.
 Item #9 "A pipe between two existing catch basins must be enlarged and the catch basins replaced."
 There is nothing in the record to suggest that such work is unacceptable to the plaintiff.
 Item #11 "Contrary to the commission's claim, Iadarola did not recommend denial of the application on this ground."
 Instead, he recommended that the plaintiff provide for the increased need in drainage control by: 1) elevating the berm around the detention basin by one foot of free board, and 2) resetting the 18 inch pipe at the correct elevation.
 Item 15 Here the engineer failed to make a representation on the drawing, i.e. he has failed to show piping. It would seem that this omission is so trivial that it could be taken care of at any time before final approval of the subdivision.
 Item 16 Heavy emphasis is given to the following statement by Iadarola. "Mr. Gallagher (Plaintiff's engineer) does bring up a good point regarding nitrogen removal, but I do not quite follow his thinking as it pertains to the path of the renovated affluent (sic)".
 This comment was made in response to Mr. Gallagher's statement contained in his letter of August 13, 1997 (Record #51). Mr. Gallagher's statement was as follows:
 "It is my professional opinion and finding, that the CT Page 6361 concern over nitrogen and other (septic) pollutants with regard to the Dean Heights water system is unfounded. The nearest well on Wild Acres is over 500' away from the Dean Heights well, and none of the septic systems are "hydraulically" upgrade from the well. The renovated effluent's path of travel is either northwest or southwest of the well(s). Dean Heights has septic systems in much closer proximity to the well systems in much closer proximity to the well (100-150'). These septics are not up to today's standards with regards to distance above restrictive soil layer or groundwater. Pollution concerns pointed at Wild Acres are ludicrous. The run off which will carry storm water passes 170 `+/- to the south of the Dean Heights well, certainly a prudent distance (as is 500' from the septic system). Renovation of pollutants in these types of soils normally occur within 25-50', with nitrogen being diluted to below 10 mg/1 after 50-100'.
 If nitrogen is a concern however, not only could no other subdivision meet this test, no other subdivision has ever been required to meet it. Furthermore, if nitrogen is a concern, then it we compare farming and spreading fertilizer, cow manure, horse manure, etc., on these fields and consider both alternatives, the Wild Acres proposal is the obvious choice, taking into consideration both erosion due to plowing and nitrogen, etc.
 All sewage effluent will be renovated prior to entering the recharge aquifer, especially with the 500' distance from the well(s). There will be no impact on the recharge area or the wells."
The fact that Mr. Iadarola "does not quite follow" Mr. Gallagher's thinking is no reason for the commission to charge the plaintiff with "unwillingness" or "inability" to comply. The record on the other hand strongly supports the likelihood that Mr. Gallagher would have endeavored to have Mr. Iadarola "follow his thinking" at the appropriate time.
 Item 53 The defendant digresses from the subject of surface water drainage and with this item takes up the subject of subsurface sewage disposal. The commission's brief (p. 11) makes reference to a CT Page 6362 statement made by the chairperson of the commission in which he criticizes the plaintiff for not addressing "what happens when you put 24 lots uphill from the Dean Heights well".[6]
First and foremost, this expression of a single member of the commission does not constitute a reflection of the commission's collective judgment and so cannot be considered by the court as a duly adopted reason for denial. West Hartford Interfaith Coalition, Inc. v.Town Council, supra at 514. Secondly, this very issue was addressed and answered by the plaintiff's engineer Mr. Gallagher in his letter to the commission dated August 13. 1997. (Record #51). Mr. Gallagher's answer may be found in the court's discussion of item 16 above. Very simply, Mr. Gallagher opined that while the subject lots may topographically be uphill from the Dean Heights well, the septic systems which serve these lots will not be "hydraulically" upgrade from the well. "Hydraulic" is defined in Webster's New World Dictionary, supra at 687 as "operated by the movement and force of liquid". It is apparent that what Mr. Gallagher meant was that the sewage effluent generated by the individual septic systems when deposited into the underground leaching fields would not run untreated, downhill into the Dean Heights well but would run northwest or southwest of the well. In any event the closest septic system in Wild Acres will be 500' from the Dean Heights well and the sewage effluent will be renovated after it travels underground for a distance of 50-100'. There is no evidence in the record to support this reason.
Third Reason. Detention Basin (Reason #6)
The plaintiff proposes to construct a basin in order to control surface water drainage, prevent flooding and improve the quality of the discharged water. It has obtained written permission from the Connecticut Light and Power Company to locate the basin within the limits of a utility easement granted to Connecticut Light and Power Company by a former owner. (Record #50). The terms of the easement which is recorded in the New Milford Land Records in volume 97 at p. 555 prohibits the erection of any structure within the boundaries of the easement.
The commission argues that the letter of permission amounts to nothing more than a revocable license but the commission's reasons do not reflect that this was the basis for its disapproval of the detention basin. The commission disapproved because notwithstanding the letter it believed that the basin constitutes a structure and was therefore prohibited by the terms of the easement. CT Page 6363
The document in question (Record #50) is a letter which grants clear and unequivocal permission to the plaintiff to locate a detention basin within its easement area subject to certain conditions which the plaintiff has indicated in the record it is willing to meet. Whether the document constitutes a license or an easement should be of no concern to the defendant. It is noted that there is nothing in the subdivision regulations (Record #36) which mandates that detention and storm water drainage facilities be located on land owned in fee simple by the subdivider. It is further noted that the zoning enforcement officer of the town of New Milford pursuant to his authority under XIX-I of the New Milford zoning regulations, (Record # 39) who has the duty to enforce the zoning regulations, has not determined the basin to constitute a structure within the meaning of the term "structure" as the defined in I-V of the regulations.
It is beyond the scope of the commission's authority and is beyond the scope of this court's reviewing authority "to determine the legal nature and effect of the letter of permission. Town Close Associates v.Planning and Zoning Commission, 42 Conn. App. 94, 107 (1996). Other avenues are opened to the parties to resolve this issue either prior to final subdivision approval or in the future should the continued effectiveness of the letter come into dispute. Gagnon v. MunicipalPlanning Commission, 10 Conn. App. 54 (1987).
Fourth Reason. Water Supply.
When the defendant denied the plaintiff's initial subdivision application for 28 lots on July 24, 1997 it gave as reason number 7, the following:
 7 The applicant submitted wells; however by virtue of the fact that the lots are within the footage requirements to the Dean Heights water system, they are required to tie into that. The applicant never submitted a waiver from the state, and no plans were ever submitted for a community water system.
By letter dated July 14, 1997 the Connecticut Department of Health granted a waiver of the requirement that Wild Acres use the Dean Heights community water system but that letter was not received in time for the commission to give it adequate consideration at its July 24 meeting. At its meeting of October 21, 1999 held pursuant to the remand order, the commission acknowledged the waiver but nonetheless proceeded to determine that the applicant had failed to show that there will be sufficient potable water to serve the subdivision. Parenthetically, it is noted that the commission erroneously believed that the applicant was CT Page 6364 seeking approval for 28 lots when in fact what was before the commission was the modified application seeking approval of 24 lots.
The plaintiff engaged the engineering firm of Leggette, Brashears and Graham to conduct a water supply feasibility study which resulted in a report, (Record, #33). That report contains the following statement: "The property is characterized by mainly well drained soils and is considered reasonably favorable area for ground water recharge. There is no evidence to suggest that individual domestic supply wells would adversely effect any off site wells, including the Dean Heights well field".
The plaintiff also produced the report of Henry T. Moeller a soil scientist who rendered his report on November 21, 1996 which stated: "The slopes run from three to fifteen percent and thus, are suitable for most construction without a large amount of cutting and filling. The soils are well drained and thus are suitable for septic systems. There are no wetlands or watercourses in the immediate vicinity of the above 26 lots". (Record, #30).
Because there is no evidence whatsoever in the record to support the conclusion reached by the commission as to the lack of an adequate potable water supply, the court must infer that both the commission and the Director of Health, upon whose opinions the commission relied, based their conclusions on the possibility of contamination of individual wells by septic effluent.
An examination of the record shows that the Director of Health advised the commission in writing as follows: "I am concerned about the fact that several of the sewage disposal systems are up slope from the wells" . . . the density of the proposed systems creates a potential for ground water pollution which may adversely effect (sic) the private wells that are down slope. The applicant should demonstrate that the expected volume of sewage effluent will not cause a detrimental effect". (emphasis added) (Record, #11).
The record is clear that the Connecticut Department of Health has approved a system of individual wells in this subdivision subject to the New Milford Health Director's approval as to "well sites's and "well water samples". Thus the jurisdiction of the local Director of Health is limited to sites and samples not to disapproval of the design for the entire subdivision.[7]
In response to the Director of Health's demand that the applicant demonstrate that "the volume of sewage effluent will not cause a detrimental effect" on the wells, the plaintiff presented Mr. Gallagher CT Page 6365 who testified at the February 6-7 and March 27, 1997 public hearings at great length. (Record #34 and 35). His testimony is replete with positive assurances that no well will be placed in jeopardy of pollution either by effluent or nitrogen. Mr. Gallagher specifically addressed the health director's concerns. The record is completely devoid of any evidence to the contrary.[8]
Guided by the Supreme Court's instruction in Kaufman v. ZoningCommission, 232 Conn. 122, 157 (1995) this court recognizes that the commission was entitled to deny the application because it did not believe the expert testimony discussed above, provided "however, the commission has the burden of showing evidence in the record to support it's decision not to believe the experts — i.e. evidence which undermines either the experts' credibility or their ultimate conclusions".
There is no discussion in the record of nor reference in the commission's reasons to the lack of credibility of the three experts which the plaintiff presented on the issue of adequacy of water supply and sewage disposal. Nor is there any evidence in the record by any other expert which contradicts the plaintiff's experts ". . . .in the absence of expert testimony, the commission was required to point to other probative evidence in the record showing that the zone change [subdivision] implicated substantial public interests". Ibid. The only evidence to which the commission may point, expert or non expert, is the Director of Health's letter of February 20, 1997 (Record, #11). In this letter the Director states his "concern for ground water pollution" of the wells by sewage effluent from the on site sewage systems. InChristian Activities Council. Congregational v. Town Council, supra at 583 our Supreme Court construed the sufficient evidence standard set forth in § 8-30g(c)(1)(A) to apply to sub parts (B), (C) and (D) of subsection (c). With that, the court went on to state that a zoning authority's burden to satisfy this standard is to demonstrate that there is a "quantifiable probability of harm" that would affect a substantial public interest which the municipality is warranted in protecting. Id. at 585. In Fairfield 2000 Corporation v. Newtown Planning and ZoningCommission, CV97-0578756S J. D. Fairfield at Bridgeport, March 19, 1999 (Mottolese, J.) this court engrafted on that test a further consideration in the analysis. That is, if the record reveals that the possibility of harm is real and the magnitude of the harm is catastrophic, then a denial on that basis would be supported by sufficient evidence.
In this case there is nothing either in the Health Director's letter or elsewhere in the record which supports a real possibility that the septic effluent might pollute the wells. The evidence is decidedly to CT Page 6366 the contrary.
 Conclusion
Examining the record with heightened scrutiny the court is unable to find sufficient evidence to avoid the conclusion that the reasons assigned by the commission were in fact pretextual. Moreover, the court notes that the stated grounds for denial of the application were such that the public interest in protecting water supplies and assuring effective drainage measures could easily have been accomplished by the commission ordering reasonable changes to the subdivision plan pursuant to § 8-30g(c)(D). Finally, the court concludes that a zoning authority cannot legitimately and honestly engage in the balancing exercise mandated by § 8-30g(c)(1)(C) if the "need" end of the balance beam can never participate in the exercise because the "authority has determined that need does not exist.
For the foregoing reasons the decision of the commission is reversed and the appeal is sustained.
BY THE COURT,
Mottolese, Judge