[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a matter of first impression which comes before the court on the application of the state of Connecticut seeking an order under General Statutes § 52-418 and common law vacating a certain arbitration award, Reversing a Termination and Imposing a Ninety-day Suspension of an employee as more fully described below.
The plaintiff, State of Connecticut, acting through the Department of Mental Retardation, ("DMR") and the defendant, New England Health Care Employees Union District 1199 (the "Union"), entered into a collective bargaining agreement covering the period July 1, 1997 to June 30, 2001. The collective bargaining agreement contains provisions respecting wages, hours, and conditions of employment for Professional Health Care Employees Bargaining Unit (UP-1) and Paraprofessional Health Care Employees Bargaining Unit members within DMR ("the collective bargaining agreement"). Pursuant to that collective bargaining agreement, the Union submitted a grievance to arbitration involving a member of the bargaining unit, the grievant James Howell who was dismissed from employment with DMR.
The submission to the arbitration panel was whether the grievance was arbitrable; and if so, was the dismissal of the grievant, James Howell for just cause. If not, what shall be the remedy consistent with the New England Health Care Employees Union District 1199 Contract. The arbitration hearing occurred on September 7, 2000, and on November 22, 2000 the arbitrator, David R. Bloodsworth, issued an award to the effect that the grievance was timely and therefore arbitrable; and further, that the state had no cause to dismiss James Howell. The arbitrator ordered the state to reinstate Mr. Howell with all lost wages and benefits, except for a period of 30 days, which would be recorded on his record as a disciplinary suspension.
The State contends that in making such an award and remedy, the CT Page 3932 arbitrator exceeded his powers or so imperfectly executed them that a mutual and final decision and definite award upon the subject matter submitted was not made as set forth under § 52-418 (a)(4), and thatinter alia: the award does not draw its essence from contract in that award and its enforcement violates explicit, well defined and dominant public policy with reference to the statutory, regulatory, or common-law of this state.
On January 9, 2001 the Union filed an application to confirm the arbitration award pursuant to § 52-417 in which it stated that the State refused to reinstate and pay wages and benefits to Mr. Howell in compliance with the arbitration award. The union also sought reasonable attorneys fees and costs and other equitable remedies as the court deemed appropriate.
The court finds the following facts to have been proved at the arbitration hearing. On August 9, 1999, James Howell a 12-year veteran of DMR was working as a mental retardation worker at Southbury Training Center when he was involved in an incident with a client, which was observed and reported by a co-worker named Lisa Miller. While Howell did not work with a client regularly, he had been made aware of the client's proclivities and how to respond to him prior to the incident. At suppertime Mr. Howell instructed the clients to go to the dining room, and the client resisted and became increasingly agitated. As the client's agitation increased, another DMR employee, Mr. Hughes, the Houses Charge, advised Howell to leave client alone and allow him to come down. Howell did not heed Hughes's advice and instead persisted in demanding that the client go to the dining room and the client became increasingly more agitated. The client began swinging his arms around vigorously. Howell grabbed the client by the upper arms and forced the client into a reclining chair which was approximately four feet away, pinching and either lacerating or cutting the client's arm. Howell claims the client fell when Howell inadvertently struck the client as Howell raised his arms in self-defense of the clients flailing blows. Lisa Miller claims that Howell laughed at the client and intentionally forced the client into the chair. Howell was aware of the DMR rules against using physical force and had attended a training course on abuse and neglect shortly before the incident. DMR conducted an investigation of the incident and as a result terminated Mr. Howell.
Statutes § 52-418 provides in pertinent part that "[u]pon the application of a party to the arbitration, . . . the superior court shall make an order vacating the award if it finds . . . (4) that the arbitrator exceeded his powers or so imperfectly executed them that a mutual, final and definitive award upon the subject matter submitted CT Page 3933 cannot be made." "Our Supreme and Appellate Courts have consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld unless an award clearly falls within the proscriptions of § 52-418 of the General Statutes." Boardof Education v. AFSCME, 195 Conn. 266, 270, 487 A.2d 553 (1985); Board ofEducation v. Bridgeport Education Assn., 173 Conn. 287, 290, 377 A.2d 323
(1977); International Union v. Fafnir Bearing Co., 151 Conn. 650, 653,201 A.2d 656 (1964); Board of Education v. Local 818, 5 Conn. App. 636,639, 502 A.2d 426 (1985). In deciding a challenge to a arbitrator's authority, the court's power is limited to a comparison of the award to the submission. Bic Pen Corporation v. Local No. 134, 183 Conn. 579,584, 440 A.2d 774 (1981). Our law favors arbitration as a means of settling private disputes and the standards of judicial review of arbitration awards minimize interference. (Internal quotation marks omitted.) Stratford v. International Assn. of Firefighters, AFL-CIO,Local 998, 248 Conn. 108, 115, 78 A.2d 1063 (1999). However, while review is generally limited to a comparison of the award to the submission, when a party challenges an award on the basis of public policy under §52-418 (a)(4), as the state has done here, the court tempers its deference. New Haven v. AFSCME Council 15, Local 530, 208 Conn. 411,416-17, 544 A.2d 186 (1988).
"This challenge is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them . . . When a challenge to the arbitrator's authority is made on public policy grounds; however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests . . . The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated . . . Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail in the present case only if it demonstrates that the board's award clearly violates an established public policy mandate."Watertown Police Union Local 541 v. Watertown, 210 Conn. 333, 339-40.
The court's review of whether an arbitral award implicates and violates public policy is de novo. Schoonmaker v. Cummings Lockwood ofCT Page 3934Connecticut, P.C., 252 Conn. 416, 418, 747 A.2d 1017 (2000). "Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. We conclude that where a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." Id., 429.
Our Supreme Court considered the application of this standard of review in State v. AFSCME Council 4, Local 387, AFL-CIO, 252 Conn. 467, 474-75,747 A.2d 480 (2000), and wrote "the trial court set forth the "two-step analysis . . . often employed [in] deciding cases such as this. First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy." State v. AFSCME, Council4, Local 387, AFL-CIO, 252 Conn. 467, 474-75, 747 A.2d 480 (2000). Applying that methodology, this court must first determine whether there exists an explicit, well-defined and dominant public policy as claimed by the state, and if the court finds that such a public policy exists, it must then decide whether the arbitrator's award violated that public policy.
The state asserts axiomatically that "there is a clear and dominant public policy that DMR must provide its clients an environment free from the risk of abuses." Our Supreme Court in Schoonmaker v. Cummings Lockwood of Connecticut, anticipating a large increase in public policy challenges urged caution in granting de novo review in the face of a bare public policy claims, emphasizing that the party making the claim that public policy was violated must do more than simply label its challenge as falling within the public policy exception. The court cautions that de novo review should not be granted "without first determining that the challenge truly braces a legitimate and colorable claim of violation of public policy." Id.
There is no express legislature declaration and there are no cases in Connecticut involving the abuse of persons with mental retardation; the state does not cite any, nor is an express legislative pronouncement to that effect.
The responsibilities of the Commissioner of DMR in is "charged with the care, training, education, treatment and custody of persons with mental CT Page 3935 retardation . . . for planning and developing . . . state-wide services for persons with mental retardation . . .; the administration and operation of the state training school, state mental retardation regions and all state-operated community-based residential facilities established for the diagnosis, care and training of persons with mental retardation." Statutes § 17a-210. Additionally, DMR is charged with the duty to report to the joint committees of the General Assembly, including the one having cognizance of matters relating to public health at least annually concerning the fulfillment of DMR's legislative mandate to care for the mentally retarded. General Statutes § 17a-211a. DMR is also responsible for conducting public hearings and drafting plans for the provision of services and presentation of those plans to the General Assembly for respecting persons with mental retardation. General Statutes § 17a-211. Moreover, the General Assembly also enactedPublic Act 94-124 which requires the Commissioner of DMR to conduct investigations of alleged abuse of individuals within its care. See General Statutes § 17a-210a (3). General Statutes § 17a-247b provides for the establishment with DMR of a registry of individuals who have been terminated from employment as a result of substantiated abuse or neglect and Statutes § 17a-247c, enacted in 1997, prohibits DMR from hiring any person on the registry. General Statutes § 46a-11d requires that "[i]f it is determined that a person with mental retardation has been abused or neglected, the director [of Office of Protection and Advocacy for Persons with Disabilities] shall refer the case to the Department of Mental Retardation for the development and implementation of a plan of protective services.") The Regulations of Connecticut State Agencies, § 17a-238-1, provides that the overall objective of an individual's `plan of care' is "to attain or maintain the optimal physical, intellectual, emotional, social or vocational functioning of which the individual is presently or potentially capable."; § 17a-238-3 (a) and (c) of those regulations state that staff shall not use force, except
when absolutely necessary and only to extent essential to protect clients from injury to themselves or to others. The legislative and regulatory scheme respecting mental retardation reflects a clear, well-defined and dominant state public policy in favor of the care and protection of persons with mental retardation. DMR clients have the right to be free from unnecessary or excessive physical constraint. Statutes § 17a-238
(e)(6). Moreover, "Each person placed under the direction of the Commissioner of Mental Retardation . . . shall be protected from harm and receive humane and dignified treatment . . . with full respect for his personal dignity." Statutes § 17a-238 (b). The General Assembly recognizes that "physical restraint" may be necessary in handling persons with mental retardation. Id.; and requires DMR to adopt regulations prohibiting the use of corporal punishment. Statutes § 17-a238(c). The existence of the state public policy to care for and protect mentally CT Page 3936 retarded persons necessarily includes a public policy to protect those mentally retarded persons in the custody of DMR and to provide them with an environment reasonably free from abuse.
Having found that public policy does exist, the critical question remains whether the arbitrator's award violated the public policy of protecting persons with mental retardation by providing them with a environment reasonably free from abuse. That analysis of this is illustrated by the court's decision in Stamford v. Stamford PoliceAssociation, 14 Conn. App. 257, 260, 240 A.2d 400 (1988). In which case the court, having recognized that public policy required police to protect the public, let stand an award enforcing a collective bargaining provision which allowed for unlimited sick pay for police officers. The court found that the provision did not undermine the public policy of protecting the public. The court must undertake a case-by-case analysis of the factual circumstances of each case in light of the public policy.Id.
Turning to the facts in this case, in support of its assertion that the public policy of providing a safe environment for mentally retarded individuals in DMR care would be violated by the reinstatement of Mr. Howell, the state cites numerous cases all of which are distinguishable from the facts in this case. All the cases cited by the state involve the commission of an intentional act (s) with aforethought and deliberation or involve arguably involuntary acts, induced by addiction. For example, the state cites State of Connecticut v. Council 4 AFSCME,27 Conn. App. 635, 608 A.2d 718 (1992). In that case an award was held to violate public policy because it ordered the reinstatement of a state employee, dismissed for misappropriation of state funds, after he admitted that he cashed falsely issued public assistance checks. The state next cites State v. AFSCME, Council 4, Local 5663 AFL-CIO,59 Conn. App. 703, State v. AFSCME, Council 4, Local 2663, AFL-CIO,59 Conn. App. 793, 758 A.2d 387 (2000) where an arbitration award reinstating an employee of the Department of Children in Families who was convicted of the procession of narcotics with intent to sell was held to violate the public policy of protecting children. The state also citesExxon Shipping Co., 801 F. Sup. 1379 (1992), in which the court held that the arbitration order reinstating an employee whose blood-alcohol level was three to four times that permitted by his employer violated public policy. Also cited was Newsday, Inc. v. Long Island TypographicalUnion. No. 915 CWA, AFL-CIO, 915 F.2d 840, 845 (2d Cir. 1990), cert. denied, 499 U.S. 922 (1991), in which an award which reinstated employee who had sexually harassed female co-workers prevented employer from carrying out its legal duty to eliminate sexual harassment in the workplace, and therefore, the award violated public policy. And lastly, CT Page 3937 the state cites State v. AFSCME, Council 4, Local 387, 252 Conn. 467, 475
(2000), where the court found that the reinstatement of a Department of Corrections employee who had violated a criminal telephone harassment statute and agency directives when he left an anonymous, obscene and racist comment on a state Senator's voice mail while on duty and while using a state owned telephone violated state public policy. Those cases are distinguishable from this case.
Mr. Howell did not deliberately harm the client. He acted under exigent circumstances and was attempting to diffuse an explosive situation involving a client with whom he was unfamiliar. Having failed to heed the suggestion of Mr. Hughes, Mr. Howell found himself caught in a situation which was out of control, physically threatening, and potentially harmful to the client and himself. The arbitrator found that his conduct constituted abuse as that term is defined by General Statutes § 17a-24a (1) which defines abuse as "the willful infliction by an employee of the physical pain or injury or . . ." That viewing the evidence in the worse possible light and rejecting Mr. Howell's claim that the client happened to fall into a chair due to the inadvertent force he reflexively exerted while deflecting the client's blows, and accepting Ms. Miller's assertion that he pushed the client in to the recliner, the court finds that Mr. Howell intended to put a client into the chair but did not intend to hurt the client in doing so. Had Mr. Howell intended to hurt the client he would not have position the client to land on a large cushioned article of furniture as he did. The simple act of selecting a recliner into which to push the client, Mr. Howell's conduct evincing concern for the client's safety and well-being. This was simply a case of poor judgment in failing to heed the advice of Charge Hughes to leave the client alone and allow him down, advice which he should have followed having been unfamiliar with the client. By failing to heed that advice, the situation careened out of control and Mr. Howell was left to make the best of a bad situation.
Having determined that Mr. Howell did not intend to harm the DMR client in question, the court turns to the question of whether Mr. Howell's conduct suggests that he might harm DMR clients in the future. The state is correct in its assertion that DMR has the responsibility to keep its clients safe from risk of harm. Accordingly, DMR may not leave its clients in the care of persons who have the proclivity to harm them. The record in this case does not suggest that Mr. Howell has such proclivities and that by leaving clients in his care it puts them at risk for abuse. Mr. Howell is a twelve-year veteran of DMR. There are no claims of any prior incidents of abuse or even suspected abuse by Mr. Howell of any DMR client. As the arbitrator noted, Mr. Howell's record is not unblemished. Had his prior misconduct involved the abuse of DMR CT Page 3938 clients surely the state would have made the court aware of that fact. Therefore, the court finds that none of Mr. Howell's prior disciplinary charges so much as implicated the abuse of the DMR client. Surely, if Mr. Howell had the proclivity to harm DMR clients that proclivity would have become apparent in the twelve years he was employed by DMR.
Mr. Howell did not intend to harm the client during the incident in question. His conduct enforcing the client into a large cushioned article of furniture, once again, illustrates his care and concern looking up clients under his care. His indiscretion was in failing to heed the advice of a co-worker who knew the client better than he, resulting in an untenable situation exacerbated by his failure to see the escalation of the client's hostilities while he still had the opportunity to retreat. Although Howell had received abuse training shortly before the incident, however the state does not contend that such training included techniques for diffusing situations similar to those Mr. Howell faced. The suspension imposed by the arbitrator has afforded Mr. Howell the opportunity to appreciate the gravity and severity of his error and to reflect upon his decision in the light of his abuse training and twelve years of experience and to develop more acute sensibilities for participating and more effective strategies for dealing with difficult clients upon his return to his employment.
In its application to confirm arbitration award the Union seeks attorneys fees and costs. "Claims for attorneys fees in the absence of statutory authority or contractual provision, however, have generally been rejected by the courts of this country, unlike those in England. In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys fee from the loser. This court has recently indicated our adherence to this so called American rule." Doe etal. v. Stephen Heintz et al., 201 Conn. 1, 14-15, 513 A.2d 1218 (1986) (internal cites omitted; quotation marks omitted). In Brookfield v.Candlewood Shores Estates, Inc. 204 Conn. 17, 22-23, 526 A.2d 1318
(1987), the court said: "In the United States, the general rule of law known as the `American Rule' is that `a prevailing litigant ordinarily is not entitled to collect a reasonable attorneys fee from the opposing party as part of his or her damages or costs.' Alyeska Pipeline [Service]Co. v. Wilderness Society, 421 U.S. 240, 247, [95 S.Ct. 1612,44 L.Ed.2d 141] (1975); Watkins v. Labor Industry Review Commission,117 Wis.2d 753, 758, 345 N.W.2d 482 (1984); Campana v. Muir,615 F. Sup. 871, 873 (M.D.Pa. 1985); Oklahoma Publishing Co. v.Miskovsky, 654 P.2d 596, 599-600 (Okla. 1982); 6 Moore, supra, 54.77[n]; 7 Am.Jur.2d, Attorneys at Law 238. There are certain exceptions to this rule. See, e.g., Campana v. Muir, supra, 874; Philadelphia GearCorporation v. F.D.I.C., 587 F. Sup. 294, 298 (W.D.Okla. 1984), rev'd, CT Page 3939476 U.S. 426, 106 S.Ct. 1931; Watkins v. Labor Industry ReviewCommission, supra; see also Moore supra. In the main, exceptions are based upon statutory or contract provisions authorizing the recovery of attorneys fees by a prevailing litigant. As in that case, this court has `been directed to no exceptions that can fairly be said to authorize the attorneys fees awarded nor do [I] perceive any authority to do so on this record. No statutory or contractual basis for such a recovery is evident.'" Brookfield v. Candlewood Estates, supra, at 22-23.
In conclusion, the unforeseeability and exigency of the situation coupled with Mr. Howell's attempt to control the client, diffuse the situation, and cushion the client's fall, lead the court to conclude that the reinstatement of Mr. Howell is not volative of public policy of protecting persons with mental retardation, and therefore, the motion to vacate the award is denied and the award is confirmed, as there is no statutory or contractual provision authorizing the award of attorneys fees, the Union's request for attorneys fees is denied.
 BY THE COURT Vanessa L. Bryant, Judge
CT Page 3940